UNITED STATES of America,
Plaintiff-Appellee,

v.

Aleazur BURRELL, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Juanita PIERCE, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Mattie MOORE, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Ernest DAVIS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Lonnie BRAGG, Defendant-Appellant.

Nos. 13959, 13962–13965.

United States Court of Appeals
Seventh Circuit.

Oct. 16, 1963.

Rehearings Denied Dec. 2, 1963.

Palmer K. Ward, Indianapolis, Ind., for Aleazur Burrell.

Leonard J. Betley, Alan H. Lobley, Indianapolis, Ind., Ross, McCord, Ice & Miller, Indianapolis, Ind., of counsel, for Juanita Pierce.

Marvin L. Hackman, Indianapolis, Ind., Thompson O'Neal & Smith, Indianapolis, Ind., of counsel, for Mattie Moore.

William C. Erbecker, James Manahan, Indianapolis, Ind., for Ernest Davis, and others.

Howard J. DeTrude, Jr., Indianapolis, Ind., for Lonnie Bragg.

Richard P. Stein, U. S. Atty., James R. Thornton, Asst. U. S. Atty., Indianapolis, Ind., Richard W. Schmude, Criminal Division, Dept. of Justice, Washington, D. C., Herbert J. Miller, Jr., Asst. Atty. Gen., Beatrice Rosenberg, Attys., Dept. of Justice, Washington, D. C., for the United States.

Before DUFFY, KNOCH and SWYGERT, Circuit Judges.

DUFFY, Circuit Judge.

The indictment herein charged the appellants and three others with having conspired among themselves and co-conspirators Pullens, Armstrong and Horne, from about March 1, 1961 to the return of the indictment (December 18, 1961) to receive, conceal, transport, purchase and sell narcotic drugs known to have been unlawfully imported into the United States in violation of Title 21 U.S.C. § 174. The indictment charged that it was a part of the conspiracy to procure heroin in Chicago, Illinois, for transportation to and sale in Indianapolis, Indiana.

Before trial, the indictment was dismissed as to Margaret Caldwell. Two defendants, one Lamar Caldwell and James Seals, pleaded guilty and testified for the Government. After a trial by jury, all of the defendant-appellants were found guilty.

In order to understand the alleged general conspiracy and where the Government claims the various defendants fitted into the scheme, it seems necessary that a somewhat detailed statement of facts be made. Viewed most favorably from the standpoint of the Government, the evidence discloses the facts hereinafter set forth.

Pullens and defendant Davis had known each other for about four years. On an occasion they met at Davis' home in Indianapolis. Pullens was a narcotic addict. Davis inquired whether Pullens had a heroin connection, and Pullens answered in the affirmative and stated that he could obtain heroin in Chicago for $160 an ounce. Davis said he would give Pullens twenty-five capsules of narcotics together with transportation and expense money for each trip to Chicago that Pullens might make for him. Pullens accepted the proposition.

The following morning Davis gave Pullens $320 and some money for expenses, and also gave him the use of his automobile, operator's permit and automobile registration. Pullens drove to Chicago where he located Lamar Caldwell. He told Caldwell he had a customer in Indianapolis who would purchase from one to two ounces each week. Pullens ordered two ounces from Caldwell and gave him $320. The two men drove to the residence of James Seals in Chicago and Caldwell purchased the heroin from Seals. Caldwell gave Pullens his unlisted Chicago telephone number. After leaving Caldwell, Pullens sampled the heroin at a filling station. Arriving in Indianapolis, Pullens met defendant Davis at the latter's home, and the two men "capped" the heroin in gelatine capsules which Davis took out of a washing machine in his kitchen.

During the remainder of March to about the end of April 1961, Pullens, following the pattern of the first trip, made eight to thirteen more trips from Indianapolis to Chicago and purchased heroin for Davis. Customarily, upon the return to Indianapolis, Pullens met Davis at the latter's home and the two men capped the heroin in gelatin capsules after which Davis usually gave twenty-five capsules to Pullens.

Prior to most of these trips, Pullens, at the direction of Davis, telephoned Cald-

well in Chicago from Davis' home telephone and either indicated the number of ounces desired or simply said that he, Pullens, would be "up" or in Chicago on the following day. In each instance, Davis gave Pullens the money for the heroin and expenses.

About the end of April 1961, Davis told Pullens he was not satisfied with the weight and measurement of the heroin obtained from Caldwell, and that he was going to contact Russell Horne in order to find a different connection in Chicago.

Shortly thereafter, Davis, in the presence of Pullens, asked Horne whether he would like to earn some heroin in return for introducing him to a narcotics supply in Chicago. Horne agreed. Thereafter the trio drove to Chicago. Horne made his connection in Chicago but was unable to obtain any narcotics. Pullens and Horne, both addicts, became "sick." Horne said he knew a girl who used to have some "pretty good stuff." The trio drove to the St. Regis Hotel and entered defendant Juanita Pierce's hotel room. Horne introduced Davis and Pullens to her stating that they were from Indianapolis and were interested in finding a "good connection." Pierce stated she knew a man "who had some pretty nice stuff." She left the room for a period. Shortly after her return, defendant Burrell entered the room. He used the name "Daddy Warbucks."

Burrell gave a package of heroin to Pierce stating that was the kind of stuff he handled; that the price was $150 per ounce and that Pierce should give some to Pullens and Horne to sample. Pierce, Horne and Pullens sat down at a table and injected themselves with some of the heroin. Davis ordered two ounces from Burrell who left the room and returned a short time later with the two ounces of heroin. Pullens and Horne sampled the heroin and Davis paid Burrell $300. Davis told Burrell that if the stuff was all right, he would be sending Pullens to Chicago once or twice a week to which Burrell replied "O-Kay." Burrell told Pierce to give Pullens a telephone number which she did. This phone was listed in the name of one McKinney who was Burrell's stepfather and where Burrell was then living.

In early May 1961, Davis told Pullens he was ready for him to make another trip to Chicago. He told Pullens to phone the Chicago number given to him (by Pierce). Davis gave Pullens money for narcotics and expenses of the trip including the use of his (Davis') automobile.

In Chicago, Pullens went to the St. Regis Hotel where he met Pierce in her room. Pullens told Pierce he was unable to contact Burrell. Pierce asked Pullens how much he wanted. He replied "two ounces." Pierce said she would get it and left the room. Shortly thereafter Burrell entered Pierce's room with two ounces of heroin. Pullens sampled the heroin and paid Burrell $300 that Davis had given him. Burrell gave Pullens the non-published Chicago telephone number of appellant Mattie Moore, and told Pullens in calling that number to ask for Mattie, telling who he was and when he would be in Chicago. Burrell said he could give Pullens a "spoon" of pure stuff for $100. Pullens said he would have to ask Davis about it. Defendant Pierce was present during these conversations. Pullens then left for Indianapolis where he assisted Davis in mixing and capping the heroin.

A few days later, Davis told Pullens in the presence of defendant Bragg, that he was ready for Pullens to make another trip; that he would try the "pure stuff" this time, and that Pullens should call the new Atlantic number. Pullens used Davis' own telephone and contacted defendant Moore saying he would "be in Chicago tomorrow." Moore replied, "Oh yes, he told me you'd call," and told Pullens to contact her in Chicago.

On the following day, Davis gave Pullens $1,000 for heroin, also expense money, and supplied him with his automobile, driver's permit and automobile registration. After reaching Chicago, Pullens called Moore. She told him to go to the St. Regis Hotel. He met Pierce in her room and told her he was expecting

Burrell. Later Burrell arrived and Pullens ordered ten spoons. Burrell left and returned in about an hour with the heroin. Pullens sampled the heroin in Pierce's presence and handed $1,000 to Burrell. Burrell mixed a shot with some mannite and gave some heroin to Pierce who also shot it. Pullens returned to Indianapolis, gave Davis seven packages of heroin but held out the remaining three packages. Davis and Pullens then mixed the heroin with manitol and milk sugar and capped it. After Davis gave Pullens the usual twenty-five capsules, Pullens split the three remaining packages with Bragg.

Throughout the remainder of May and up to June 14, 1961, Pullens made from five to ten additional trips to Chicago and obtained narcotics for Davis. On occasion, Pullens travelled to Chicago and returned by bus. On these trips, Pullens contacted Moore by telephone and she would tell him where to meet Warbucks (Burrell). Pullens would meet Burrell in Pierce's hotel room and purchase heroin from Burrell in Pierce's presence with money supplied by Davis. Pierce, who obtained her supply from Burrell, loaned heroin to Pullens while he waited in her hotel room for Burrell. Later, Pullens would repay the loan when he received his supply from Burrell. On occasion Bragg assisted Pullens and Davis in capping the heroin. Any amount held out by Pullens from Davis was split by Pullens with Bragg.

In late May 1961, Davis told Pullens he was contemplating letting Charles Armstrong sell narcotics for him because Bragg lived too far from a certain location in Indianapolis where most of the addicts lived. Shortly thereafter, Armstrong agreed, in the presence of Bragg, Pullens and Davis, to sell narcotics for Davis who was to receive two dollars for each capsule sold with Armstrong retaining one dollar. This was the same arrangement Bragg had with Davis.

In late May 1961, because of the suspected presence of a narcotic officer in the neighborhood, Pullens, Davis and Bragg mixed and capped heroin in the home of Pullens' mother.

On June 14, 1961, Pullens and Armstrong made another trip to Chicago. Pullens telephoned defendant Moore and she directed them where to go. Moore had been selling heroin for Burrell on consignment. She said she had a boy friend buying stuff from New Orleans and would give Pullens and Armstrong a better deal. Later that day, Burrell telephoned Moore's apartment, and Pullens who answered the telephone ordered some heroin. Burrell subsequently arrived at the apartment and gave some of the heroin to Moore and gave Pullens seven spoons in exchange for $700 supplied by Davis.

On the return to Indianapolis, Pullens and Armstrong were arrested by a city motor patrolman and two city narcotic detectives. The automobile in which they were riding had been checked at fifty miles per hour in a thirty mile zone.

■ We reject the claim of each defendant-appellant that the evidence in this record is insufficient to support the verdict. A conspiracy was clearly shown centering around Davis with Pullens as his agent, to obtain heroin in Chicago for distribution and sale in Indianapolis.

Davis was the dominant member of the conspiracy. Burrell (Daddy Warbucks) was the dominant member residing in Chicago. In Indianapolis, Davis, Pullens and occasionally Bragg, mixed and capped the heroin obtained by Pullens in Chicago. Bragg, Armstrong and one Bellamy sold the heroin capsules in Indianapolis. All of the Indianapolis defendants knew the source of the narcotics.

Several of the appellants make some point of the fact that the Indianapolis group was supplied by two Chicago supplier groups and argue this shows two separate conspiracies. We think there was but one conspiracy which had one object, namely, to procure heroin in Chicago for transportation to and sale in Indianapolis. Each supplier knew the heroin was destined for Indianapolis and actively and purposely furthered this illegal object.

Appellant Davis urges the defense of illegal search and seizure, but neither Davis nor any other defendant saw fit to move to suppress the seized evidence on these grounds either at or before the trial. None of the appellants objected to the introduction of the seized materials on the ground that their constitutional rights had been violated. We, therefore, do not consider this point. United States v. Sferas, 7 Cir., 210 F.2d 69.

We overrule the contention of defendant Burrell that since the first trial ended in a mistrial,[1] the double jeopardy provisions of the Fifth Amendment barred the instant prosecution. The mistrial was granted on Burrell's motion and with his express consent. He cannot successfully plead the bar of double jeopardy. Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901; Raslich v. Bannan, 6 Cir., 273 F.2d 420.

Burrell and other defendants argue the evidence in this case fails to show that the powder substance identified by the Government chemists as heroin hydrochloride is, in fact, a narcotic drug as defined by Title 26 U.S.C. § 3228(g). We think this contention cannot be sustained. The Government chemists, in describing the product, said it was " * * * A chemical product known as diacetyl morphine, a narcotic drug." The defendants argue it should have been shown that the seized material was opium, isonipecaine, coca leaves or opiate, or any derivative thereof.

This Court passed on this contention in United States v. Pisano, 7 Cir., 193 F.2d 355, 31 A.L.R.2d 409. We said at page 359 of 193 F.2d: "We are not concerned with technical chemical designations. We know from common knowledge that heroin, even though it be found in a compound, is always a derivative of opium. As we said, in United States v. Holmes, 7 Cir., 187 F.2d 222, 225, 'this court, as a matter of judicial knowledge, is justified in affirming the trial court's finding that heroin is a derivative of opium.' Such was the conclusion also in Hughes v. U. S., 8 Cir., 253 F. 543, 545."

Defendant Moore claims instructions No. 20, 26 and 19 were erroneous. No. 20 had to do with possession of narcotics. We think this instruction was without error. United States v. Santore, 2 Cir., 290 F.2d 51. Instruction No. 26 was on aiding and abetting. We think it contains a correct statement of the law. Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503; Pereira v. United States, 347 U.S. 1, 9, 74 S.Ct. 358, 98 L.Ed. 435. Instruction No. 19 as to the definition of narcotic drugs was not erroneous.

Defendant Davis objected to instruction No. 16, claiming it was not "full enough." We hold this instruction was sufficient. Davis also objected to instruction No. 25 on the nature of the conspiracy. We can find no error in this instruction.

Admittedly, the Government had weaker cases as to defendants Juanita Pierce and Mattie Moore. However, from the evidence hereinbefore set out, it clearly appears that Miss Moore had constructive possession of the narcotics, the purchase, transportation and sale of which was the object of the conspiracy. She, in effect, managed the sale on the first contact as well as many times thereafter. Miss Pierce was a knowing member of the conspiracy and actively promoted its ends. She played a vital part in making the arrangements for a number of the transactions.

Both Miss Pierce and Miss Moore took the orders, made arrangements and even used their own premises for the purpose of transfers. In United States v. Wright, 7 Cir., 309 F.2d 735, the Court found sufficient evidence of constructive possession of narcotics under circumstances "when viewed in [their] totality" which

---

1. The Court, upon motion, had ordered a separation of witnesses. Thereafter, two witnesses had occupied the same jail cell and discussed the case before trial. When this was brought to the attention of the Court, a mistrial was ordered.

were much less compelling than in the instant case.

Various other alleged errors have been asserted by the different defendants. We have considered them but hold them to be without substance. We find no reversible error as to any of the defendants in the instant case.

Mr. Alan H. Lobley, Mr. Leonard J. Betley, Mr. Marvin L. Hackman, Mr. James Manahan and Mr. Howard J. De-Trude, Jr., all members of the Indianapolis bar, represented the various defendants on this appeal as court-appointed counsel. They made the trip from Indianapolis to Chicago to present oral arguments. Their services were in the highest tradition of the American bar. We thank them for their services and compliment them on the excellent manner in which they prepared their briefs and presented oral argument.

Affirmed.