**UNITED STATES OF AMERICA,**
Plaintiff-Appellee,

v.

**Tommy RIZZO, Frank Tornabene and
Sam Elia, Defendants-Appellants.**

**Nos. 17149–17151.**

United States Court of Appeals
Seventh Circuit.

Sept. 18, 1969.

Rehearings Denied in No. 17150, 17151
Nov. 17, 1969.

Jerome Rotenberg, John Powers Crowley, Edward J. Calihan, Jr., Chicago, Ill., for defendants-appellants.

Thomas A. Foran, U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Michael B. Nash, Eugene Robinson, Asst. U. S. Attys., Chicago, Ill., of counsel.

Before SWYGERT and FAIRCHILD, Circuit Judges, and MORGAN, District Judge.[1]

ROBERT D. MORGAN, District Judge.

A jury found defendants guilty upon all counts of a six-count indictment. Each has appealed the judgment entered thereon, committing him to the custody of the Attorney General of the United States for a period of five years on each count.[2] All sentences are concurrent.

We first consider defendants' challenge to the indictment.[3]

Count One, grounded upon 18 U.S.C. § 371, alleged that the defendants and one Eileen Curry conspired together to use the United States mails with the intent and purpose of promoting and carrying on an unlawful business enterprise involving prostitution offenses in violation of Illinois Revised Statutes, c. 38, Sections 11–14 through 11–19, in violation of Section 1952 of the Criminal Code, 18 U.S.C.[4] The indictment contains five substantive counts. Count Two of which is herein summarized as representative of all.[5] That count al-

1. Judge Morgan is sitting by designation from the Southern District of Illinois.

2. Robert Smith, a fourth defendant, did not appeal.

3. The issue is advanced by Tornabene and Elia only. Unless the context requires particularization, each issue will be treated as if it were advanced by all defendants.

4.         "COUNT ONE
"The NOVEMBER 1965 GRAND JURY charges:
"1. That beginning on or about the First day of February, 1964, the exact date being unknown to the Grand Jury, and continuously thereafter until on or about the First day of December, 1964, the exact date being unknown to the Grand Jury, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division, and Elsewhere, the defendants,
   FRANK TORNABENE,
     ALSO KNOWN AS FRANKIE T.:
   SAM ELIA,
     ALSO KNOWN AS SAM CASH:
   TOMMY RIZZO; AND,
   ROBERT SMITH,
and the following co-conspirator not named as a defendant herein,
   EILEEN CURRY,
     ALSO KNOWN AS BUNNY,
did unlawfully, wilfully and knowingly conspire, combine, confederate and agree among themselves and with each other and with divers other persons to the Grand Jury unknown, to commit certain offenses against the United States, to-wit, to use facilities in interstate commerce, to-wit, the United States mail, with intent to promote, manage, establish and carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a business enterprise involving prostitution offenses, in violation of the laws of the State of Illinois, to-wit, Illinois Revised Statutes, Chapter 38, Sections 11–14 through 11–19, and thereafter to perform acts of promotion, management, establishment and carrying on of the said unlawful activity; in violation of Title 18, United States Code, Section 1952."
The count specifies seven objects of the alleged conspiracy and five overt acts done pursuant thereto.

5.         "COUNT TWO
"The NOVEMBER 1965 GRAND JURY further charges:
"That on or about the 27th day of April, 1964, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division, the defendants,
   FRANK TORNABENE,
     ALSO KNOWN AS FRANKIE T.;
   SAM ELIA,
     ALSO KNOWN AS SAM CASH;
   TOMMY RIZZO; and,
   ROBERT SMITH,
did unlawfully, wilfully and knowingly use a facility in interstate commerce, to-wit, the United States mail, between Chicago, Illinois, and Charleston, South Carolina, with intent to promote, manage,

leged that the defendants, on or about April 27, 1964, at Chicago, Illinois, unlawfully used the United States mails between Chicago, Illinois, and Charleston, South Carolina, with the intent to promote and carry on an unlawful business enterprise involving prostitution offenses, in violation of Illinois Revised Statutes, c. 38, Sections 11–14 through 11–19, and that they thereafter performed and attempted to perform acts to further such unlawful activity in violation of 18 U.S.C. § 1952.[6]

■ Defendants contend that the indictment is insufficient because it does not set forth the elements of the offenses defined in the several Illinois Statutes related to prostitution, and that the indictment is duplicitous because it alleges in each count an attempt to violate seven different sections of the Illinois Criminal Code, without specifying which of such sections defendants are alleged to have violated.

■ The argument is specious. The requirements of Rule 7(c), F.R.Crim.P., are satisfied if the indictment sufficiently apprises a defendant of the nature of the charge which he must meet and if its allegations are sufficiently specific to stand as a bar to further prosecution for the same offense. Hewitt v. United States, 8 Cir., 110 F.

2d 1, 5–6, cert. denied, 310 U.S. 641, 60 S.Ct. 1089, 84 L.Ed. 1409.

The gravamen of the charge under both Sections 371 and 1952 is the violation of federal law. Cf. United States v. Nardello, 393 U.S. 286, 293–296, 89 S.Ct. 534, 21 L.Ed.2d 487. As it relates to the substantive counts, the offense is the use of an interstate facility, with the intent to promote or further an unlawful activity in violation of state law, and the performance of some act designed to promote or further that illegal purpose. United States v. Bergland, 7 Cir., 318 F.2d 159, 161, cert. denied, sub nom. Cantrell v. United States, 375 U.S. 861, 84 S.Ct. 129, 11 L.Ed.2d 88; McIntosh v. United States, 8 Cir., 385 F.2d 274, 276, 277–278; Collins v. United States, 10 Cir., 383 F.2d 296, 300; cf. United States v. Nardello, supra. Reference to state law is necessary only to identify the type of unlawful activity in which the defendants intended to engage. McIntosh v. United States, supra, 385 F.2d at 276; Collins v. United States, supra.

It is not necessary to allege the elements of the state substantive offense intended to be committed, cf. United States v. Nardello, supra, or that the unlawful objective intended was accomplished. McIntosh v. United States,

---

establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a business enterprise involving prostitution offenses in violation of the laws of the State of Illinois, in which state such offenses were committed, to-wit, Illinois Revised Statutes, Chapter 38, Sections 11–14 through 11–19, and thereafter did perform and attempt to perform acts of promotion, management, establishment and carrying on of the said unlawful activity;

"In violation of Title 18, United States Code, Section 1952."

Each of counts three through six, inclusive, is identical to Count Two, except that each alleges that the defendants used the United States mail for the stated unlawful purpose between Chicago, Illinois, and another city in a state other than Illinois.

6. 18 U.S.C. Section 1952, provides in pertinent part:

"(a) Whoever * * * uses any facility in interstate * * * commerce, including the mail, with intent to—

* * * * * *

"(3) Otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in sub-paragraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving * * * prostitution offenses in violation of the laws of the State in which they are committed * * *."

*supra; cf.* United States v. Bergland, *supra.*

The duplicity argument must likewise fail. Defendants are not charged with the commission of the substantive offenses under state law. Each count charges a single federal offense, and it is immaterial whether the unlawful enterprise intended, if consummated, would constitute a violation of one or a dozen state statutes. The allegation as to state law only identifies as unlawful the enterprise which the use of interstate facilities was designed to promote.

Defendants' reliance upon United States v. Donovan, 7 Cir., 339 F.2d 404, and Wright v. United States, 6 Cir., 243 F.2d 546, is misplaced. In *Donovan,* the indictment alleged two substantive charges in the disjunctive, 339 F.2d at 407–408. The indictment in *Wright* merely referred to the penal statute by section number, without particularizing which of several offenses defined by the statute the defendant was alleged to have committed. 243 F.2d at 548. By contrast here, the charge is explicitly stated. The multiple-statutory reference merely delineates the intent element of the substantive offense charged.

Other contentions of error by the defendants relate to the conduct of the trial itself and to the factual background of the offenses which the evidence tended to prove.

The evidence, taken in the light most favorable to the government, tended to prove the following.

In the early part of the year 1964, Curry operated a house of prostitution at 334 West Menomonee Street, in Chicago, Illinois. In addition to Curry, as "madam" of the house, three women, including one Alma Smith, were residents of the house and there engaged in prostitution. A man by the name of Zuckerman was the financial backer of the Menomonee Street enterprise.

In February, 1964, the Menomonee operation was terminated after a raid on the house by Chicago police. Later, Zuckerman and defendant Tornabene came to the house and talked in the hallway with Curry. After they left, Curry told Alma Smith that Zuckerman was out and that she had new partners coming in to the prostitution operation.

On the day following that meeting, a man by the name of Miller, a former patron of the house, came to the Menomonee address and offered to rent Curry space for the operation of a house of prostitution in a building owned by him and his brother at 1847 North Cleveland Avenue in Chicago. On the same day, Zuckerman, Curry and Alma Smith visited the Cleveland Avenue building, at which time Curry gave Miller several hundred dollars as a deposit on the rent for the building. Immediately thereafter, Curry and the prostitutes who had been working at the Menomonee house moved into the Cleveland Avenue building.

Upon moving into the Cleveland Avenue building, Curry told the prostitutes that they would have to pay to her fifty per cent of their earnings and also $10.00 per night for room rent. That split contrasted to the previous arrangement under which a prostitute retained 60% of her earnings and paid 40% of her earnings to the madam who operated the house.

A few days after moving into the Cleveland Avenue building, the defendant Tornabene came to the building. At that time he had a conversation with Alma Smith and left. He was not there as a patron. After he had left, Curry told Alma Smith that Tornabene was one of her new partners. Several days later the defendants Rizzo and Elia visited the building. Elia installed a bar on the second floor. Subsequently, the defendants, Elia and Rizzo and Robert Smith, had a conversation with Curry, in which it was agreed that Robert Smith was to be paid $100 for his services to the house, which included his operation of an automobile owned by Elia for the transportation of prostitution patrons to and from the house. The prostitutes began working in

the house four days after Curry accepted the premises for occupancy. The original rental agreement provided for a daily rent of $50.

During the first five days of operation at Cleveland Avenue, Alma Smith tabulated the daily earnings of the prostitutes and collected the madam's share for her. Later Curry told the prostitutes to check each day with Elia. Thereafter, Elia met each of the prostitutes in the barroom at the end of the day and collected the appropriate percentage of their receipts.

In early March, 1964, defendants Rizzo and Elia brought to the Cleveland Avenue building a box of file cards which they told Curry were the names of potential customers for the house of prostitution. Rizzo represented that he had paid $6,000 for the card index file, and that Curry would pay $2,000 of that cost and the other partners the balance of $4,000.

Using the card index file, small identification cards (sometimes referred to in the testimony as credit cards) were prepared for many of the names contained in the file. Alma Smith testified that Rizzo, Elia, Curry and the resident prostitutes, including herself, prepared such cards for mailing. Curry typed the address of the building on the cards and enclosed a note therewith. The cards were then sealed in envelopes which were addressed and stamped for mailing and were taken from the house for mailing by Rizzo and Elia. Smith testified that Tornabene was present during a part of the time when such cards were being prepared.

Alma Smith further testified that Rizzo, Elia and Tornabene were at the house daily and that they were not patrons or customers of the house of prostitution.

In March, 1964, a dispute arose as to the amount of rental to be paid for the Cleveland Avenue building, when the owners of the building stated that they were going to raise the rent to $75 or $100 a day. The testimony indicates that this discussion was held between Curry, Rizzo, Elia and the Miller brothers. On the day following that discussion, Curry told Alma Smith that she would have to call Tornabene about the rent. Curry placed a telephone call, and immediately following that call, which she said was made to Tornabene, she told Alma Smith a decision had been made and they were moving.

About one week later, Curry and the prostitutes moved from the Cleveland Avenue building to an apartment at 7529 South Constance Avenue in Chicago. During the time when Alma Smith was at the Constance Avenue apartment, all three of the defendants visited the apartment daily. While at that address, Curry, Elia, Rizzo, Tornabene, Robert Smith and the prostitutes in the house filled out envelopes and cards for mailing to prospective customers. Rizzo and Elia took the envelopes with them when they left saying that they would be mailed. Alma Smith testified that Tornabene was present during that conversation involving the cards.

A Mr. Ascher, an insurance agent, had a conversation with Curry at the Constance Avenue address in April of 1964. Curry told Ascher that she was moving and placed an order for fire insurance on a building located at 521 West Dickens Street, Chicago. Ascher went to the Dickens Street address on April 24, 1964, where he observed movers delivering furniture and other persons installing carpeting, draperies, and a telephone in the premises. Curry introduced Ascher to Tornabene and Elia at that time and place.

On April 27, 1964, Alma Smith moved to the Dickens Street house. On that morning she saw Tornabene at the premises and borrowed his automobile for the purpose of running an errand.

During the evening of April 27, 1964, a detective of the vice-control division of the Chicago Police Department placed a phone call to the number of the Dickens Street address, where he spoke to a party who identified herself as Shirley.[7] He

7. Shirley was one of several names used by Curry.

arranged for a date later the same evening. Shortly after eleven o'clock on the evening of April 27, 1964 that detective and other members of the Chicago Police Department went to the Dickens Street address where Curry, Smith and two other prostitutes were arrested and charged with prostitution, pandering, and keeping a house of prostitution. The detective also seized a composition notebook containing names and addresses of various persons and some credit cards from Curry's bedroom.

While the police were still at the building, a Robert Garrett of Gary, Indiana, walked into the door with his credit card in his hand. He was also placed under arrest. While the police were there the telephone rang, and Alma Smith was instructed by the police to answer the phone. The caller was Tornabene. She pretended in her conversation that the caller was a customer, whereupon Tornabene asked her if the girls were "'busted." She answered yes. Tornabene immediately hung up the phone.

Curry was prosecuted and convicted of the offenses of soliciting for prostitution, pandering, and keeping a place of prostitution.

Robert Garrett testified that he had played cards with Tornabene, Elia and Rizzo in the second-floor bar of the Cleveland Avenue house in the early spring of 1964.

John William Harrell testified that he received one of the credit cards by United States mail at Baltimore, Maryland, in the spring of 1964, and that the card had his name and address thereon. John O'Hanasian testified that he received a card in the United States mail at Danvers, Massachusetts, which had his name and address on the front thereof. The back of the card bore the name "Logan Morris, South Constance, City." Robert Lee Crane received a card bearing his name by mail at Birmingham, Alabama. The envelope in which the same was delivered bore the return address, "Logan Morris, 7259 South Constance, Chicago, Illinois." Robert Woodward received a like card by mail at Dubuque, Iowa. The

cancellation mark upon the envelope in which the same was enclosed indicated that the stamp had been cancelled at the Main Post Office in Chicago on April 27, 1964. H. E. Coleman received such a card by mail at Charleston, South Carolina, with the cancellation mark upon the enclosing envelope being dated April 27, 1964.

Elia was arrested by FBI agents on December 2, 1965. Shortly after his arrest he stated to FBI agents that he knew Eileen Curry as the madam of a house of prostitution at 1847 North Cleveland Avenue, Chicago; that he was a cab driver and had taken "tricks" to that house of prostitution; that he had drinks there on one occasion with Robert Garrett, and that on other occasions he had had drinks there after he had brought customers to the house; that he knew Tornabene and Rizzo, but only as cab drivers who frequented the near north side of Chicago; and that he had no knowledge of Curry's use of credit cards in the operation of the house of prostitution.

That statement was admitted into evidence as to Elia, only, over the objection of the other defendants.

Elia now contends that the judgment against him must be reversed because the warnings given to him by FBI agents did not meet the requirements set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and the statement was, therefore, not admissible. We reject the argument.

FBI Agent Wolf testified that he had arrested Elia. At that point, Elia's counsel advised the court that he wished to make an objection outside the presence of the jury. The jury was excluded and Elia then moved to suppress any statement allegedly made by him to FBI agents. The United States Attorney then advised the court, outside the presence of both the jury and the witness, what Wolf's testimony would be relative to *Miranda* warnings given to Elia prior to interrogation. Counsel for Elia then stated to the court that he desired the

agent's testimony under oath upon the suppression motion.

Wolf was then examined by Elia's counsel. He testified that he had told Elia, shortly after his arrest and prior to any interrogation, among other things, that he had the right to talk to an attorney before answering any questions. He testified further than an Agent Duhurst had later told Elia, among other things, that he had the right to talk to an attorney before answering any questions, and that if he could not afford an attorney one would be appointed for him. Thereafter, Elia's oral statement was made.

No further evidence was adduced upon the motion to suppress. The motion was denied.

The jury was then returned, at which point Elia's counsel stated to the court that "there was no affirmative waiver by Mr. Elia at that time." The court reaffirmed its ruling of admissibility of the statement.

Wolf then testified before the jury, his testimony being expressly offered as evidence against Elia only. The other defendants objected to the admissibility of any statement upon the ground that they would be, respectively, prejudiced thereby. Their objections were overruled, and Wolf then testified without further objection by Elia's attorney.

As it related to *Miranda* warnings given, this testimony added only the fact that Elia had stated to Duhurst that he understood his rights. Wolf then testified to Elia's statements relative to his knowledge of the operation of the Cleveland Avenue house of prostitution, as hereinabove summarized.

■ The warning given to Elia did not include his advisement, as required by *Miranda*, of his right to have an attorney present during any interrogation. Miranda v. Arizona, *supra*, at 471–472, 478–479, 86 S.Ct. 1602. Had the point been specifically raised by objection, the statement should have been suppressed, *e. g.*, Chambers v. United States, 5 Cir., 391 F.2d 455, 456; Windsor v. United States, 5 Cir., 389 F.2d 530, 533–535, but the argument made here was never advanced in the District Court. The suppression hearing was granted upon a general objection. The only suggestion then advanced by counsel was that lack of proof of an affirmative consent to interrogation required suppression. No objection was made to Wolf's testimony before the jury on Elia's behalf.

■ Absent a record showing that plain and substantial error intervened, failure to raise the specific objection to admissibility of the statement waived the issue on appeal. United States v. Lyon, 7 Cir., 397 F.2d 505, 508, 510, cert. denied, sub nom. Lysczyk v. United States, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117; United States v. Indiviglio, 2 Cir., 352 F.2d 276, 278–280, cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663; United States v. Burrell, 7 Cir., 324 F.2d 115, cert. denied, 376 U.S. 937, 84 S.Ct. 791, 11 L.Ed.2d 657; *cf*. United States v. Costello, 2 Cir., 381 F.2d 698, 700.

This record admits of no doubt that the foundation laid for admissibility upon the motion to suppress was considered sufficient by Elia's counsel. No specific objection to the sufficiency thereof was made. Objections on behalf of the other attorneys were limited to the objection that the statement of Elia made outside the presence of their respective clients would prejudice their clients. There was no specific objection to the sufficiency of the foundation for admissibility of the statement.

No plain and substantial error intervened in the premises which would require reversal. The statement was limited to Elia's admission that he knew Curry had operated a house of prostitution, that he had, in his work as a cab driver, transported "tricks" thereto, and that he had, on occasions, had drinks in the bar at the house. He further stated that he had not been paid by Curry, but that his fare had been paid by the customer transported. The main effect of the statement was cumulation. To a

lesser degree, it tended to corroborate Alma Smith's testimony.

■ The arguments of the other defendants upon this aspect of the case are wholly without merit. Elia's statement did not tend to inculpate either Tornabene or Rizzo, or in any manner connect them with, or impute to them knowledge of, the Cleveland Avenue house of prostitution. This court's decision in United States v. Fellabaum, 7 Cir., 408 F.2d 220, is pertinent. We there held that the erroneous admission of a post-conspiratorial statement by one conspirator against a co-conspirator was not prejudicial since the statement did not directly inculpate the co-conspirator and the record contained substantial independent evidence of the entire conspiracy. 408 F.2d at 225–226; to the same effect, Calhoun v. United States, 9 Cir., 368 F.2d 59, 62. Here, expressly, the statement was admitted as to Elia only.

■ The defendants contend, however, that there should be a reversal because Elia's statement tended to prove one element of the offense, namely, prostitution. The fallacy of that argument lies in the fact that prostitution is not an element of any offense charged, but only evidentiary and indicative of the element of intent in the federal offense. Both Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, and United States v. Haupt, 7 Cir., 136 F.2d 661, are clearly distinguishable from and have no application to the case at bar.

■ Defendants next contend that it was error to admit in evidence the testimony of Alma Smith as to certain statements made by Curry outside the presence of defendants. Curry was called as a witness by the Government. After stating her name and address, she invoked the Fifth Amendment and refused to answer the next succeeding question by Government counsel. She advised the court, outside the presence of the jury, that she would invoke the Fifth Amendment privilege against self-incrimination to all other questions asked by the Government. She was then excused as a witness.

Thereafter, Alma Smith testified as to her association with Curry and the defendants, and as to her employment as a prostitute in the several houses of prostitution hereinabove mentioned. She was permitted to testify, over objection, to statements made to her by Curry that Tornabene was one of Curry's partners, that the phone call concerning rent had been made to Tornabene, and other statements by the alleged co-conspirator of a similar nature.

Defendants argue that permitting Smith's testimony as to such statements denied to them the right of confrontation and cross-examination, citing Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934; United States v. Guajardo-Melendez, 7 Cir., 401 F.2d 35, and Evans v. Dutton, 5 Cir., 400 F.2d 826. None of those cases involved a conspiracy charge as does the case before us, and all are otherwise factually distinguishable.

Viewed in a proper light, there is more here than permitting Curry, who had refused to testify, to testify through the lips of Alma Smith. Curry, though not indicted, was named in the indictment as a co-conspirator. There can be no question that Alma Smith was vitally interested in the subject matter of the conspiracy. She was a prostitute, earning her livelihood as such. As a prostitute, she represented the one salable commodity necessary to the business of prostitution. She had been associated with Curry, in the relationship of prostitute and madam, in operations prior to the date alleged for the beginning of the conspiracy. After the Menomonee operation was raided and closed, continued pursuit of her profession, if she were to remain associated with Curry, depended upon Curry's obtaining a house in which to operate and the necessary financial backing for operation of a house of prostitution. There is ample other evidence of the conspiracy, from Smith's own knowledge, supported by witness Ascher, as related herein-

above. The statements of Curry related to such operations were admissible against Curry's co-conspirators. *E. g.*, Lutwak v. United States, 344 U.S. 604, 617–619, 73 S.Ct. 481, 97 L.Ed. 593; United States v. Kahn, 7 Cir., 381 F.2d 824, 838–839, cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661; United States v. Halpin, 7 Cir., 374 F.2d 493, 495, cert. denied, 386 U.S. 1032, 87 S.Ct. 1482, 18 L.Ed.2d 594.

We are not faced with the admission, in a "thin" substantive case, of a statement by a co-defendant, designed only to inculpate the appellant, as in United States v. Guajardo-Melendez, *supra,* 401 F.2d at 36–39, or with hearsay testimony as to a statement imputed to an accomplice who was then not on trial, Evans v. Dutton, *supra,* 400 F.2d, at 828, 830, or with the admission of an exculpatory statement of a co-defendant, tending only to inculpate his alleged accomplice, United States v. Gordon, 7 Cir., 253 F.2d 177, 183. Nor are we faced with a deliberate ruse by a prosecutor to admit damning hearsay by subterfuge as in Douglas v. Alabama, *supra.*

The next contention of error relates to the court's admission in evidence of certified copies of an indictment against Curry and of a judgment of her conviction in a state court of prostitution charges.

After Curry's refusal to testify, the Government sought first to introduce a certified copy of her conviction of the state offenses. An objection to the exhibit was sustained because it did not show upon its face that the conviction related to the arrest on April 27, 1964, and to the Dickens Street raid. Thereafter, the Government retendered that exhibit in conjunction with a certified copy of the indictment which led to the judgment order. Those exhibits were admitted over objection.

■ At the outset, we think the exhibits were irrelevant to any issue in the case and, as such, that they were erroneously admitted. The trial judge, partly in response to arguments by defendants,

had taken the position that it was incumbent upon the Government to prove a violation of state law. In that context, he stated that he thought that proof of a violation of state law was necessary and that the exhibits were admissible as evidence of that facet of the case.

Proof that a state law has actually been violated is not a necessary element of the offense defined in Section 1952. *E. g.*, United States v. Bergland, *supra;* McIntosh v. United States, *supra; cf.* Spinelli v. United States, 8 Cir., 382 F.2d 871, 893–894, rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. It was unnecessary to prove the conviction of Curry or anyone else of the State violations referred to in the indictment.

The error in admitting such records was, in part, invited by positions taken by defendants in the trial court, and they should not now be permitted to assert that error unless its magnitude is such that failure to reverse would constitute a manifest injustice.

That error was not prejudicial. There was abundant proof that defendants were engaged with Curry in a scheme to promote prostitution, and that they mailed the cards with the intent and purpose of promoting and fostering the business of prostitution. These exhibits were merely innocuous and repetitious cumulation of evidence related to the element of intent in the offense charged.

■ We next consider related contentions that the evidence was insufficient to prove that the defendants had any connection with the mailings charged in counts two through six of the indictment, or that defendants did any act in furtherance of the alleged enterprise subsequent to the mailing of the cards in issue.

Relative to the first contention, Alma Smith described the cards used, the method by which they were prepared and mailed, and the routine employed in circularizing the persons whose names appeared in the index card file. She testified that the five cards introduced

in evidence, in support of the allegations of counts two through six, were similar to cards which she had helped to prepare for mailing.

Defendants argue that the cards were not admissible because she could not testify, positively, that they were cards prepared and mailed by the defendants, or by their direction. They rely upon United States v. Panczko, 7 Cir., 353 F.2d 676.

This case is in no sense parallel to *Panczko,* in which there was a clear break in the chain of custody of evidence. The testimony failed to prove that the keys admitted in evidence were the same keys which, previously, had been delivered to police officers.

Smith's identification of the exhibits was sufficient for their introduction in evidence. *E. g.,* United States v. Reed, 7 Cir., 392 F.2d 865, 867, cert. denied, 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445; Pinkney v. United States, 124 U.S.App.D.C. 209, 363 F.2d 696, 698. The failure of positive identification bears upon the weight of the evidence, not its legal efficacy.

Alma Smith testified that she had moved to the Dickens Street house on the morning of April 27, 1964, and that she had been there arrested on the night of the same day. One of the arresting officers testified that he had phoned a "Shirley" at that house on the evening of April 27th, and that he had arrived at the house with other policemen shortly after eleven o'clock p. m. on that day. To the extent that the precise date of mailings was established, the exhibits had been cancelled at the Chicago Post Office on April 27th. One stamp had been cancelled during the afternoon period, which extended from twelve o'clock noon until twelve o'clock midnight. Defendants argue from such facts that there is no proof that any act was done subsequent to the mailing to promote the unlawful activity.

Upon the evidence of record, the jury could have found that the Dickens Street house was operating until a time

between 11 p. m. and midnight on April 27th. The evidence is uncontradicted that a Chicago detective had reserved the services of a prostitute at the Dickens address by a phone call prior to 11 p. m. on that date. The jury could find that each defendant was an active participant in Curry's enterprise of supplying prostitutes to the public.

The strongest case which defendants can make is the argument that the mailings may have been made after the raid and that the envelopes had been processed through all handling and the Post Office cancelling machines during the partial hour between the raid and midnight. In the first place, that assumption is not permissible when the evidence is considered, as it must be, in the light most favorable to the Government. In the second place, if any valid argument could be made on this point, it must be restricted to the argument that the time sequence, *per se,* creates a reasonable doubt as to one element of the offenses charged. This is not true. The time element presented a question for resolution by the jury. When the evidence is considered in the light most favorable to the Government, together with all reasonable inferences therefrom, this contention by defendants must fail. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

Contentions of reversible error related to the court's instructions to the jury are without merit.

Defendants did not request an instruction related to Curry's right to invoke her Fifth Amendment privilege, and they may not now object that such an instruction was not given. Rule 30, F.R.Crim.P.; Namet v. United States, 373 U.S. 179, 190, 83 S.Ct. 1151, 10 L. Ed.2d 278; United States v. Schwartz, 7 Cir., 398 F.2d 464, 470, cert. denied, sub nom. Pyne v. United States, 393 U.S. 1062, 89 S.Ct. 714, 21 L.Ed.2d 705; United States v. Vasen, 7 Cir., 222 F.2d 3, 5, 6, cert. denied, 350 U.S. 834, 76 S.Ct. 70, 100 L.Ed. 744. Defendants were obviously satisfied that no

cautionary instruction was necessary, and the court's failure to give such an instruction without request was not plain error. Namet v. United States, *supra.*

Sanders v. United States, 9 Cir., 373 F.2d 735; Fletcher v. United States, 118 U.S.App.D.C. 137, 332 F.2d 724, 725–726, and United States v. Maloney, 2 Cir., 262 F.2d 535, 537, cited by defendants, are inapposite. Each of those cases involved deliberate misconduct in calling a witness, with knowledge that he would refuse to testify, and pursuing a course of interrogation designed to prejudice the accused person on trial. There is here no charge of misconduct against the Government. The record clearly reveals that the prosecutor was surprised by Curry's refusal to testify, and that no effort was made to pursue further examination of her when that fact became known.

■ The remaining contention with respect to instructions relates to the court's instructing the jury as to the admissibility of evidence of acts and statements of one co-conspirator against all.

The instructions given in this case were comparable to the instructions approved by this court in United States v. Allegretti, 340 F.2d 243, dissenting opinion at 251, adopted on rehearing, 340 F.2d 254, cert. denied, 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433. This jury was advised that it must first determine whether the existence of a conspiracy was proved, and then determine from the acts and declarations of each defendant whether he became a participant in that conspiracy; and that, contingent upon the jury's finding, beyond a reasonable doubt, that both of such facts were proved, then the acts and declarations of each co-conspirator were admitted against all who the jury found to have joined in the conspiracy. The instructions were correct.

This case is not comparable to United States v. Pronger, 7 Cir., 287 F.2d 498, 499–500, in which the instructions were so phrased that the jury could construe

them as a conclusionary statement by the court that a joint enterprise had been proved.

The lack of virtue in verbosity is recognized, but the context of these appeals was deemed to require substantial exposition upon the several contentions of error. We have considered all arguments advanced, and all nuances thereof, and all authorities cited by defendants. We do not conclude that this was a perfect trial, if any ever was, but the record admits of no doubt that the defendants, and each of them, had a fair trial. They cannot demand more. Bruton v. United States, *supra,* 391 U.S., at 135, 88 S.Ct. 1620, 20 L.Ed.2d 476; Lutwak v. United States, *supra,* 344 U.S., at 619, 73 S.Ct. 481, 97 L.Ed. 593.

Each of the judgments is affirmed.