UNITED STATES, Appellant,

v.

Alan Duane SEDGWICK, Appellee.

No. 8125.

District of Columbia Court of Appeals.

Argued Jan. 16, 1975.

Decided Sept. 30, 1975.

Stay Denied Dec. 15, 1975.
See 96 S.Ct. 558.

Edward D. Ross, Jr., Asst. U. S. Atty.,
with whom Earl J. Silbert, U. S. Atty., and
John A. Terry, Roger M. Adelman, and
John E. Drury, III, Asst. U. S. Attys.,
were on the brief, for appellant.

Linda Huber and W. Gary Kohlman, Washington, D. C., for appellee.

Before REILLY, Chief Judge, and KERN and YEAGLEY, Associate Judges.

REILLY, Chief Judge:

This appeal by the government from a dismissal of an indictment [1] by a trial court

---

1. The indictment charged the defendant with the following: first degree burglary while armed (D.C.Code 1973, §§ 22–1801(a), –3202), first degree burglary (–1801(a)), armed robbery (–2901, –3202), robbery (–2901), assault with intent to commit rape while armed (–501, –3202), assault with intent to kill while armed (–501, –3202), as-

in a case where it had previously declared a mistrial presents two substantial constitutional questions. The first is whether the court erred in holding that the prosecution deprived the accused of due process by its failure to disclose to the defense in advance of trial a certain police report (FD–252) under the doctrine of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The second is whether this question is moot, defense counsel contending that even had the trial court erred, it would be futile to reinstate the dismissed indictment because the double jeopardy clause would bar a second trial.

It would be academic to pass upon the merits of the government's appeal before deciding whether in this posture of the case a retrial is not precluded by the Fifth Amendment protection against being "twice put in jeopardy."

The defendant charged by the indictment here was picked up by the police some three weeks after they had received a report of a burglary in a townhouse near DuPont Circle, in the course of which the burglar attempted to rape a young housewife and did stab her husband. According to the testimony at trial, a married couple, asleep in one apartment of this house, were awakened in the early hours of October 29, 1972 by a stranger, a young Negro male, who placed a knife at the wife's throat and demanded money. After discovering a few dollars hidden in a chest of drawers, the intruder forced the husband into the bedroom closet and tried to coerce the wife into sexual intercourse. As the husband broke out the closet to defend her, the burglar turned on him with a knife, stabbed him in the stomach and chest, and made a getaway. The victims gave a description of their assailant to the police after the

husband was taken in an ambulance to a hospital for treatment of his wounds.

Although a detective from the sex squad, Edward L. Allen, canvassed the DuPont Circle neighborhood in an effort to learn the identity of the burglar, it was not until November 18th that an arrest was made. On that day, the husband, having been discharged from the hospital, saw an attendant in a parking lot a few blocks from his house whom he felt sure was the man who had broken into his apartment. He telephoned the police, who came and arrested the man—the defendant, Sedgwick. The following morning the defendant was interviewed at the precinct station, where he was confined, by Detective Allen and admitted that he was the person who had forced his way into the complainants' apartment.[2]

Before the government rested its case, Detective Allen was called to the stand to testify as to the circumstances in which the oral confession was made. Later in *voir dire* examination the witness referred to some reports he had placed in the jacket of the investigation file several days before the arrest. Apparently both trial counsel were unaware of certain of these reports, particularly a Form PD–252, dated October 31, 1972, which was then produced in court, examined by the judge, and made available for the first time to the defense. Defendant's counsel moved orally for dismissal on the ground that this report should have been given him prior to trial.

The officer was then questioned outside the presence of the jury at some length. He testified that he took a further statement from the female victim and also interviewed a number of possible informants as well as neighbors and several passers-by in the area. One of them—a stranger with

---

sault with intent to kill (–501), and assault with a dangerous weapon (–502).

2. The defendant made a written statement in addition to this oral confession but it was subsequently suppressed at a pretrial hearing before another judge. A motion to suppress the oral confession was denied. The ground for the suppression of the written document was that the accused had asked the police to provide a lawyer to read it before he signed it, but no lawyer was furnished.

whom he had talked the previous day—told him of hearing that a man known as "Duvall" had been boasting about committing the assault which the officer was investigating.

The text of this report (PD–252) was:

> Respondent to 18th and S, N.W. Canvassed area spoke with subject who related that he had heard that subject known as Duvall N/M 20's 5′9″ Dark who hangs around "Bimbo's" 1600 Block Conn. and the French "Underground" 20th and P N.W. Had been bragging that he had committed the assault in the 1900 Block of S St., N.W.

> Responded to CCB.[3] Checked Nickname file.
> Several Duvall's in File.

Apparently finding nothing in the file he deemed helpful, Detective Allen followed up the stranger's tip by going to the two bars referred to in his report, but as none of their employees or customers could recall a "Duvall" or provide any corroboration, he concluded that this lead was fruitless, and pursued other avenues of investigation.

The trial court, after learning that another Assistant United States Attorney was aware of the Allen report, held that this document did constitute *Brady* material. Then, ascertaining that the defendant was not asking for a mistrial but insisting on his motion to dismiss, the court sua sponte granted a mistrial "in the interest of justice and as a matter of necessity."

Discharging the jury and reserving disposition on the dismissal motion, the court then directed both sides to utilize the contents of the report for further investigation. Subsequently on December 20, 1973 and January 15, 1974, the trial court heard testimony of a Public Defender investiga-

tor who had attempted to develop something tangible from the report, and further testimony of Detective Allen. Neither investigator had been successful in finding anything which would corroborate the tip or even the identity of the person who gave it. The court then dismissed the indictment on the theory that because of the passage of time, the failure of the government to turn over the asserted *Brady* material at arraignment 13 months earlier had prevented the defendant from ever being able to use it effectively.

It is from this dismissal that the government has appealed, saying that the trial court clearly misconstrued the *Brady* case, *supra,* and its progeny, by declaring a pretrial duty on the part of the prosecution to have released the police report which did not come to light until the trial. The defense argues that even though we should agree with the government on the *Brady* issue, we should not reverse and reinstate the indictment, as any new trial based on such indictment would be barred by the double jeopardy clause of the Fifth Amendment.[4] The contention is that if the trial court's determination of the *Brady* question was incorrect, there was no "manifest necessity" for declaring a mistrial and consequently a retrial of the defendant is barred by this provision of the Constitution.

There is a certain plausibility to this argument which rests heavily upon some observations of the Supreme Court in *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), and a recent decision of this court, *United States v. Bristol*, D.C.App., 325 A.2d 183 (1974).

▮ The question presented is a close one. The general rule is that jeopardy first attaches when, in a jury trial, the jury is impanelled and sworn or, in a

---

3. CCB is a standard police abbreviation for Central Cell Block.

4. The Fifth Amendment provides *inter alia* that no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ."

nonjury case, when the first evidence is presented before a trial judge.[5] *See Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). There, immediately after the jury had been selected and sworn and a recess taken, the government successfully moved when the court reconvened for the discharge of the jury on the ground that the government's key witness was not present. The Supreme Court reversed the convictions in a later trial for the reasons that the second prosecution constituted double jeopardy inasmuch as the reason given did not justify in terms of "manifest necessity" a second trial.

In the *Bristol* case, we sustained a trial judge's action in granting a motion to dismiss on double jeopardy grounds because we were unable to discern the exact reason for the first trial judge's declaring a mistrial. In that instance the trial judge, after some rancorous interchanges with counsel, stated that he did so because he felt that one of the co-defendants was not receiving adequate representation, although it seemed apparent that this particular defense counsel's aggressive cross-examination had severely undercut the prosecution's case. This court concluded that the "declaration of mistrial was not based upon a 'scrupulous exercise of judicial discretion' [citing *United States v. Jorn,* 400 U.S. 470 at 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971)] and cannot be justified on an accepted basis which permits a second trial." (Footnote omitted.)[6]

Although the double jeopardy clause in the Fifth Amendment owes its origin to the common-law rule that a prior judgment of conviction or acquittal barred a new trial for the same offense, these cases are illustrative of how far the Supreme Court has gone over the years in granting a broader immunity from a second prosecution than the original doctrine contemplated.[7] Nevertheless not every trial which is terminated prior to verdict or final judgment prevents the government from subjecting the defendant to another trial on the same charges. Early in our history, the Supreme Court granted the government a retrial in a case where a mistrial had been declared after a jury deadlock. In that case, Mr. Justice Story laid down the historic guideline that the right to retry should be accorded after mistrial only where "there is a manifest necessity for the act, *or the ends of public justice would otherwise be defeated."* *United States v. Perez,* 9 Wheat. (22 U.S.) 579, 580, 6 L.Ed. 165 (1824) (emphasis supplied). Thus the Supreme Court at the time of *Perez* recognized that even though the declaration of mistrial was not justified on grounds of "manifest necessity", there were circumstances under which denial of a new trial would defeat the ends of public justice.[8]

To hold in this case that an erroneous mistrial would bar the government forever from laying before a jury the question of the innocence or guilt of a man against whom there was strong evidence of the

---

5. "But in cases in which a mistrial has been declared prior to verdict, the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial." *Illinois v. Somerville,* 410 U.S. 458 at 467, 93 S.Ct. 1066, at 1072, 35 L.Ed.2d 425 (1973).

6. *United States v. Bristol, supra* at 187.

7. The Commentaries of Coke and Blackstone refer to the development in King's Bench of such pleas in bar as *autrefois acquit* and *autrefois convict.* An interesting account of

the legislative history of the amendment against this background is given by Mr. Justice Marshall in a recent opinion, *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975).

8. The *Perez* case has never been overruled and was described in a recent decision as: "The fountainhead decision construing the Double Jeopardy Clause . . . [a formulation] consistently adhered to by this Court in subsequent decisions . . . ." *Illinois v. Somerville, supra* 410 U.S. n. 5 at 461–62, 93 S.Ct. at 1069.

commission of a most atrocious crime would scarcely comport with the views expressed in *Perez*. Nevertheless subsequent decisions of the highest court indicate that preventing a possibly guilty man from going free may not be the paramount objective of public justice. For example, the previously noted decision of the Supreme Court in *Jorn, supra,* and this court in *Bristol,* had the practical effect of vesting the defendants with immunity from further trial but the courts deemed this factor outweighed by a policy against subjecting individuals to the harassment of multiple trials or, as explained in *Green v. United States,* 355 U.S. 184 at 187, 78 S.Ct. 221 at 223, 2 L.Ed.2d 199 (1957):

> The underlying idea . . . is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense . . . .

The *Downum* case also reflects this same approach, but this case is not easy to reconcile with *Brock v. North Carolina,* 344 U.S. 424, 73 S.Ct. 349, 97 L.Ed. 456 (1963), where retrial was permitted after mistrial on the prosecutor's motion occasioned by refusal of two of his witnesses to testify for self-incrimination reasons, or with the Court's later holding in *United States v. Tateo,* 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964), where a reprosecution was held in order after a guilty plea was set aside because of coercion from the trial court. An examination of the authorities shows that it is difficult to ascertain just what circumstances justify a second trial following a mistrial granted by a judge in error.[9]

In *Gori v. United States,* 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961), Mr. Justice Frankfurter, in his majority opinion, sought to clarify the law by holding that a sua sponte declaration of a mistrial even over the objection of the defendant would not preclude a subsequent retrial if the trial court's motive was to benefit the defendant, notwithstanding that the mistrial ruling might have been improvident:

> Suffice that we are unwilling, where it clearly appears that a mistrial has been granted *in the sole interest of the defendant,* to hold that its necessary consequence is to bar all retrial . . . . [*Id.* at 369, 81 S.Ct. at 1527 (emphasis added).]

If the rationale of the *Gori* case is still good law, that decision would compel us to hold that in the case before us the double jeopardy contention is without merit, for the challenged ruling of the trial court was plainly intended to benefit the defendant's side.

The waters were muddied again in 1971 by the *Jorn* decision, *supra,* where Mr. Justice Harlan, writing for a plurality of four, observed that "a limitation on the abuse-of-discretion principle based on an appellate court's assessment of which side benefited from the mistrial ruling does not adequately satisfy the policies underpinning the double jeopardy provision." 400 U.S. at 483, 91 S.Ct. at 556. The author of the opinion was at pains not to overrule *Gori,* however, pointing out that the cases were distinguishable, the mistrial ruling in *Jorn* apparently being motivated by a desire to protect certain witnesses rather than the defendant. The court noted [*id.* at 486, 91 S.Ct. at 558]:

> In sum, counsel for both sides perform in an imperfect world; in this area, bright-line rules based on either the source of the problem or the intended beneficiary of the ruling would only disserve the vital competing interests of the Government and the defendant. The trial judge must recognize that lack of preparedness by the Government to continue the trial directly implicates policies underpinning both the double jeopardy

9. *See Annotations* to The Constitution of the United States, Doc. No. 92–82, 92d Cong., 2d Sess. 1096 (1973).

provision and the speedy trial guarantee. Cf. *Downum v. United States*, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 10') (1963). Alternatively, the judge must bear in mind the potential risks of abuse by the defendant of society's unwillingness to unnecessarily subject him to repeated prosecutions. Yet, in the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.[10]

In any event, two years later in *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), where the mistrial was granted on a prosecutor's motion after he had discovered subsequent to jury empanelling that the indictment was fatally defective because of the absence of an essential allegation, the Court in a 5–4 decision held that a second trial for the same offense but under a new indictment was not precluded. The majority opinion, written by Mr. Justice Rehnquist, considerably narrowed the sweep of *Jorn* by quoting with approval certain passages from *Gori*, stressing deference to the discretion of the judge declaring a mistrial, *id.* at 463, 93 S. Ct. 1066, and emphasizing an observation in *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), where the defendant's interest in proceeding to verdict was deemed outweighed by the desirability of an ultimate fair judgment (*id.* 410 U.S. at 470, 93 S.Ct. at 1073), *viz.*:

> What has been said is enough to show that a defendant's valued right to have

his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.

■ As the ruling of the trial judge in *Somerville* was undoubtedly correct—any guilty verdict had the trial been allowed to proceed being doomed on appeal—*Illinois v. Somerville* did not determine the precise issue presented here, *viz.*: the problem of mistrial based upon a reasonable but erroneous belief that the trial was irreparably flawed. One reason for the dearth of controlling authority is that a mistrial ruling, not being a final order, is not subject to direct judicial review. In the case before us the appeal of the government is from the dismissal of the indictment, an order amounting to a final judgment, rather than the declaration of mistrial itself. The more typical double jeopardy cases reach appellate courts on appeal from a conviction which is the result of a second trial,[11] or on a habeas corpus proceeding collaterally attacking such a conviction.[12] Hence appellate courts in considering the double jeopardy question address themselves not to the issue of whether the trial judge's mistrial ruling was legal error, but rather whether his action in depriving a defendant, over his objection, of an opportunity to have his fate determined by the first jury after jeopardy had attached, was so "erratic", "unreasonable" or lacking in discretion as to subject the defendant to the unnecessary ordeal of a new trial.

The majority opinion in the *Somerville* case, *supra* at 462, 93 S.Ct. at 1069, notes that the *Perez* formulation "abjures the application of any mechanical formula by

---

10. The *Jorn* plurality opinion does not stand for the proposition that any improvident termination of the first trial creates a double jeopardy bar, unless such termination was in the form of a directed verdict of acquittal. This exception was recognized in *Fong Foo v. United States*, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962), where such a verdict was directed before the government completed its case—the trial judge becoming indignant over what he deemed unethical coaching of

a witness by the prosecutor. Agreeing with the circuit court's finding of an abuse of discretion, Mr. Justice Harlan, the author of the *Jorn* opinion, in concurring, said that if the case had been aborted by a mistrial ruling, rather than a directed acquittal, a subsequent prosecution could have gone forward.

11. *E. g.*, *United States v. Jorn*, *supra*.

12. *E. g.*, *Illinois v. Somerville*, *supra*.

which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial."

Citing this admonition, the Court of Appeals for the Fourth Circuit in a case which came before it shortly after the *Somerville* opinion was published refused to bar a reprosecution following a mistrial based on a ruling that one of the jurors had been improperly influenced by inadvertently overhearing arguments presented after the jury had been excluded. While the court indicated that the better practice would have been to substitute an alternate juror, thus letting the case proceed to verdict, it decided that because of unique circumstances the discretion of the trial court should not be disturbed. *Whitfield v. Warden of Maryland House of Corrections*, 486 F.2d 1118 (4th Cir. 1973), *cert. denied*, 419 U.S. 876, 95 S.Ct. 139, 42 L. Ed.2d 116 (1974). A similar conclusion was reached by the Fifth Circuit in another post-*Somerville* decision, *Smith v. Mississippi*, 478 F.2d 88 (5th Cir.), *cert. denied*, 414 U.S. 1113, 94 S.Ct. 844, 38 L.Ed. 2d 740 (1973), where a mistrial following an inquiry into an offhand remark of a juror to a bailiff was held not to bar retrial —the court disclaiming as "of no particular concern, whether we would not have reached a different result." In short, both *Whitfield* and *Smith v. Mississippi* seem to support the view that a ruling based on a "reasonable but erroneous belief" that a trial should not be allowed to proceed does not establish a valid double jeopardy plea in the absence of any judicial or prosecutorial impropriety designed to avoid an acquittal, thereby providing the government with an opportunity to present a stronger case.[13]

In our opinion, the reasoning of the circuit courts in *Whitfield* and *Smith v. Mississippi* rests upon a sound analysis of the leading Supreme Court decisions and should be followed in disposing of the double jeopardy issue in the case now before us. Plainly, the trial court's decision to discharge the jury here was not calculated to help the prosecution in any respect,[14] but to provide the defendant with information which might have strengthened a potential defense of mistaken identity.[15] Acting upon a good faith but possibly mistaken belief that the defense was entitled to this information long before the beginning of the trial, the court nevertheless tried to avoid a declaration of mistrial by suggesting to counsel the feasibility of granting a continuance until the materiality of the newly disclosed information could be explored in an out-of-court investigation. Defendant's counsel was unwilling to agree to such a course of action because of other trial commitments. The trial judge, then faced with what he deemed to be probable reversal had the trial proceeded and resulted in a conviction, then inquired as to defendant's willingness to consent to a mistrial, but counsel insisted that the dismissal—for which he had moved orally when the police report

---

13. *See United States v. Jorn, supra* 400 U.S. at 485, 91 S.Ct. 547. Although the Supreme Court decided three cases in its current term where double jeopardy was asserted, none shed any real light upon the instant problem. In only one of them was the double jeopardy claim upheld—a case tried without a jury and dismissed because the judge found that the facts did not bring the defendant within the statute. *United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975). But in *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), the claim was rejected with respect to a post-trial order setting aside a guilty verdict, and also rejected in *Serfass v. United States*, 420 U.S. 377, 95 S.Ct. 1055, 43 L. Ed.2d 265 (1975), an appeal from dismissal of an indictment.

14. In this respect the instant case is quite different from the ruling criticized by this court in *United States v. Bristol, supra*. While the declaration of mistrial in that case was obviously not motivated by any desire to assist the prosecution, it nonetheless would have had such impact.

15. Defendant had already disclosed his intention to call alibi witnesses in his defense.

was first brought to light—was the proper remedy. It was not until this point—preceded by two days of inquiry into the circumstances of the report and its follow-up —that the court announced that manifest necessity compelled a mistrial, and discharged the jury.

 Weighing, as we must, the competing interest of the defendant in having "his trial completed by a particular tribunal . . . [and] the public's interest in fair trials designed to end in just judgments",[16] we have concluded that in this instance the contention of double jeopardy must be rejected. The trial judge's ruling can scarcely be characterized as "erratic"[17] or made in circumstances disclosing a plain lack of discretion, as his decision was arrived at only after the defendant had vigorously urged a violation of the *Brady* principle. Moreover, while the defendant did not expressly consent to a mistrial—preferring the more drastic remedy of dismissal—at no time did his counsel draw to the attention of the court "the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate."[18] In fact, his attitude was such that it was not until filing his answering brief on appeal that he set any store upon a "valued right" to completion of the trial by the first jury.

 Turning now to the issue raised by the government's appeal, we recognize the dilemma confronting the conscientious trial judge when almost by accident he learned in mid-trial that the government possessed but had not revealed a report that the police at one time heard a street rumor pointing the finger of suspicion at an individual known by a name other than defendant's.

Nevertheless an examination of the *Brady* opinion and subsequent decisions of the Supreme Court, where the application of that doctrine was an issue, compel us to conclude that he was in error in holding that the prosecution owed a duty of pretrial disclosure respecting such report. What the Supreme Court has called "the heart of the holding" in *Brady* was [19]

> [T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. [*373 U.S. at 87, 83 S.Ct. at 1196.*]

The key word in this holding is "material". Thus the standard by which the government's conduct in the case before us must be measured is whether the undisclosed police report was evidence material to the guilt or innocence of defendant Sedgwick.

In urging this court to sustain the contrary holding of the trial court, the defendant argues that nothing could be more material to the issue of guilt and favorable to the defendant than another person's admission that the offense was committed by him, not by the defendant. But here the so-called "admission by another person" never reached the level of evidence. It was inadmissible hearsay—a street rumor which remained unverified despite an immediate effort by the investigating officer to ascertain whether there was such an individual and whether he had indeed made the remarks attributed to him.

In *Brady*, what the Supreme Court deemed material to one of the principal issues was an actual statement by a co-defendant in a murder trial that he and not

16. *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949).

17. This was the characterization of the ruling in the *Jorn* case, *supra*, as described in the *Somerville* opinion, *supra* 410 U.S. at 469, 93 S.Ct. 1066.

18. *United States v. Jorn, supra* 400 U.S. at 486, 91 S.Ct. at 558.

19. *See Moore v. Illinois*, 408 U.S. 786, 794, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

Brady had strangled the deceased. This case was followed by *Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), a conviction for rape where consent was an issue raised by the defense. The court deemed the nondisclosure by the govenment of evidence of promiscuity on the part of the prosecutrix improper, as it deprived the defense of crucial impeachment material on an issue upon which guilt or innocence turned.

In both *Giles* and *Brady*, there was no doubt that the information withheld from the defense was exculpatory evidence which actually existed. In *Moore v. Illinois, supra,* where the prosecution did not disclose *inter alia* a police report of a fruitless investigation—a raid on a tavern to find a suspect known as "Slick" who was not on the premises, the Supreme Court refused to disturb the conviction, stating:

> We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. Here, the elusive "Slick" was an early lead the police abandoned when eyewitnesses to the killing and witnesses to Moore's presence at the Ponderosa [the scene of the fatal shooting] were found. . . . [408 U.S. at 795, 92 S. Ct. at 2568.]

■ Mr. Justice Marshall, writing partly in concurrence and partly in dissent, conceded that "frivolous information and useless leads can be ignored . . . ." [408 U.S. at 809, 92 S.Ct. at 2575.] We regard the nondisclosed PD–252 report in the instant case as falling in the same category. At the time the investigating detective made this report, there were no other leads in the case. As the officer pursued this one promptly, we see no reason for inferring that the police investigation was not carried out with vigor and good faith. It is true that after the defendant was in custody, the detective abandoned this trail. By that time, however, not only had a positive identification been made by the principal victim, but the defendant had confessed to the crime. The trial court apparently overlooked this aspect of the matter in finding that a more extended investigation might have turned up the missing "Duvall".[20] Also ignored was the possibility that if the rumor had any substance at all, the defendant himself may have been the mysterious "Duvall". At the time of the report, the defendant was at large and known to frequent this same neighborhood.[21] In view of the defendant's subsequent revelations after his arrest, he, like "Duvall", could scarcely be characterized as tightlipped. All this of course is a matter of speculation, but no more speculative than the trial court's final conclusion that dismissal of the indictment was warranted because of the possibility that the trail to "Duvall" had become cold only because of lapse of time.

■ In our opinion, *Moore v. Illinois, supra,* makes clear that the information contained in the undisclosed police report was not the kind of material which the prosecution should have furnished the defendant in advance of trial. Accordingly the order dismissing the indictment must be set aside.

Reversed and remanded for a new trial.

---

20. Under the doctrine of *Jenkins v. United States*, D.C.App., 284 A.2d 460 (1971), the pretrial denial of the motion to suppress the oral confession became the "law of the case" and was binding upon the trial court.

21. At the trial, a woman occupying a basement apartment in the building where complainants lived, identified the defendant as a man who had tried to force his way into her apartment a few nights before the upstairs burglary, which was the subject of the indictment.