**UNITED STATES of America, Appellant,**

v.

**Sylvio J. GRASSO, Appellee.**

**No. 276, Docket 76–1284.**

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1976.

Decided March 9, 1977.

Rehearing En Banc Denied June 21, 1977.

---

12. See Memorandum of Senator Burchill, Governor's Bill Jacket, Laws 1937, ch. 545.

Michael Hartmere, Asst. U. S. Atty., New Haven, Conn. (Peter C. Dorsey, U. S. Atty., New Haven, Conn., of counsel), for appellant.

Jon G. Rothblatt, New York City (Henry B. Rothblatt, Rothblatt, Rothblatt, Seijas & Peskin, New York City, of counsel), for appellee.

Before SMITH, OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

This appeal presents the recurring issue whether retrial of the defendant appellee after his original trial ended in a mistrial declared by the trial judge sua sponte would violate the double jeopardy clause of the Fifth Amendment. The issue is one said to "escape meaningful categorization," as "virtually all of the cases turn on the particular facts," *Illinois v. Somerville,* 410 U.S. 458, 464, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973). Appeal here is by the Government from an order of the United States District Court for the District of Connecticut, Robert C. Zampano, *Judge,* granting the appellee's motion to dismiss his indictment for tax evasion on double jeopardy grounds. 413 F.Supp. 166 (D.Conn.1976). We affirm.

On April 16, 1975, appellee was indicted on three counts of income tax evasion for the years 1969, 1970 and 1971, pursuant to 26 U.S.C. § 7201. Trial began on November 4, 1975, before T. Emmet Clarie, Chief Judge, and a jury. During the next eight trial days the Government called over 40 witnesses, one of whom was a Daniel Harris; the defendant presented ten witnesses, including himself; the Government called three witnesses in rebuttal; over 300 documents were admitted as exhibits; and the parties filed extensive requests for jury instructions. On November 26, 1975, when only the Government's final rebuttal witnesses remained to be heard, Judge Clarie declared a mistrial on his own motion after a two-day hearing.

The mistrial was precipitated by a recantation by Government witness Harris,

a multiple offender then serving a term of imprisonment of eight to thirty years imposed in 1971 for the sale of heroin. He had received favorable consideration from the Board of Parole and was to be released from prison in December, 1975. His direct testimony was to the effect that he and the appellee, Grasso, had engaged in numerous transactions involving the sale of heroin in the year 1970. The testimony thus established an illegal source for the appellee's alleged unreported income in that calendar year. Harris's testimony did not relate to the tax years 1969 or 1971. His testimony lasted a day and a half and consumed over 120 pages of transcript.

Several days after Harris had testified, he contacted the appellee's son, who in turn advised him to contact the court or appellee's counsel, Henry Rothblatt. Harris telephoned Judge Clarie's law clerk and asked him to tell Rothblatt to call "Dan" at a given number. Rothblatt proceeded to interview Harris at the local jail, where he was being held, and tape-recorded a full recantation of Harris's trial testimony. The recanting witness stated that his false testimony was influenced by threats made by Government prosecutors and Internal Revenue Service agents in charge of the tax case, the alleged threats being that his parole would be revoked, that he would have to serve the full 30 years of his sentence, and that he might in addition be indicted on a perjury charge because his previous grand jury testimony in the instant case.

Rothblatt immediately informed the court of Harris's recantation and filed a motion to dismiss based on prosecutorial misconduct. *See, e. g., Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Hearings were held outside the presence of the jury, with ten witnesses testifying, but Harris refused to testify, relying on the Fifth Amendment. Judge Clarie declared a mistrial on the basis that the defendant Grasso could "not get a fair and impartial trial under the present circumstances," since "the issue would become whether or not he was selling narcotics, and whether or not . . . Harris could be believed," rather than whether or not Grasso evaded taxes. In Judge Clarie's view there was a "manifest necessity for declaring a mistrial" so that "the ends of justice, public justice, would [not] be defeated." Judge Clarie found no improper conduct on the part of the prosecutors or Government agents. He explicitly stated that "the issue of double jeopardy could be argued" in the event the Government decided to proceed with a retrial. The Assistant United States Attorney recorded his objection to the declaration of mistrial "for the record." For the defense Mr. Rothblatt said: "Of course, your Honor, the defendant agrees with everything that your Honor has decided, except your Honor's decision to declare it a mistrial. We would renew our request for judgment of acquittal."

The Government subsequently sought to retry appellee, who moved to dismiss the indictment on double jeopardy grounds. Judge Zampano granted the motion, so that it is the Government that appeals that decision.

### I.

The Government's first argument is that the defendant consented to the declaration of a mistrial. The law is plain enough that, if a defendant himself moves for a mistrial or he consents to a declaration of mistrial made on the court's own motion or on the motion of the prosecution, he will be considered to have waived any double jeopardy plea. *See, e. g., United States v. Dinitz,* 424 U.S. 600, 607–08, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *United States v. Tateo,* 377 U.S. 463, 467, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); *United States v. Goldstein,* 479 F.2d 1061, 1065–68 (2d Cir.), *cert. denied,* 414 U.S. 873, 94 S.Ct. 151, 38 L.Ed.2d 113 (1973); *United States v. Pappas,* 445 F.2d 1194, 1199–1200 (3d Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971); *United States v. Burrell,* 324 F.2d 115, 119 (7th Cir. 1963), *cert. denied,* 376 U.S. 937, 84 S.Ct. 791, 11 L.Ed.2d 657 (1964); Note, *Mistrial and Double Jeopardy,* 49 N.Y.U.L.Rev. 937, 948

(1974). But here the appellee neither requested a mistrial nor consented thereto. As Judge Zampano found below, "the only motion offered or intended to be offered [by the appellee] was the motion to dismiss," 413 F.Supp. at 170, and, from Judge Clarie's two references during his oral ruling to the principle of double jeopardy, it may be inferred that he believed he was granting a mistrial sua sponte and not in response to the defendant's request, *cf. United States v. Gentile,* 525 F.2d 252, 255 (2d Cir. 1975) (fact that judge was unaware of double jeopardy problem contributes to inference that defense counsel consented to mistrial), *cert. denied,* 425 U.S. 903, 96 S.Ct. 1493, 47 L.Ed.2d 753 (1976).

■ Nor can Mr. Rothblatt's remarks made after the judge had ruled, quoted above, in any way be construed as consenting to the mistrial. He very plainly said that he agreed with everything the court said, "except your Honor's decision to declare it a mistrial," and he renewed his request for a judgment of acquittal. It is true that he did not say that he objected to the mistrial and wished to proceed to the jury, but affirmative consent may not be inferred from that silence.

## II.

■ The Government argues in the alternative that, if there were no actual consent to the mistrial, consent should be implied because defense counsel's conduct precipitated the mistrial. *See United States v. Gentile, supra,* 525 F.2d at 252–58; *United States v. White,* 524 F.2d 1249, 1252 (5th Cir. 1975), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976); *cf. United States v. Dinitz, supra* (no double jeopardy where misconduct by chief defense counsel in opening statement resulted in his expulsion, followed by defense request for mistrial). Following the Government's launching of an investigation into the reasons for the witness Harris's recantation, particularly whether there were threats of violence made against the witness, attorney Rothblatt's office voluntarily turned over to the Government memoranda of interviews of one Joseph Rose and of Harris conducted by attorney Ronald Goldfarb, a law clerk in that office. These interviews had been conducted in September, 1975, in connection with a pending civil rights action in which appellee Grasso was the plaintiff; the interviews took place on or about September 10, 1975, two months prior to commencement of trial in the criminal case. The Government calls our attention to the fact that the Goldfarb memoranda state that Harris told Goldfarb that he (Harris) had lied to Government agents concerning Grasso's activities in narcotics, and that Goldfarb had reason to believe Harris would sign a statement to that effect after his parole hearing scheduled for September, 1975. Thus the Government argues that defense counsel knew or should have known by September, 1975, that there was a contradiction in stories by Harris and failed to disclose this information to Judge Clarie. The Government therefore contends that the mistrial was a direct result of defense counsel's late production of the contradictory statement of Harris. The suggestion is that the defense chose not to contradict Harris with his prior inconsistent statement but waited until the trial was nearing completion to move for dismissal on the basis of the inconsistent statements in the tape recording of Harris.

When this suggestion of improper conduct on the part of defense counsel was made below, not by affidavit but by a "supplemental memorandum" in opposition to the defendant's motion to dismiss, Mr. Rothblatt filed an affidavit, uncontroverted in the record, stating that, at the time Goldfarb interviewed Harris and certain other inmates incarcerated in the Hartford area, "we were not aware that Harris was going to be a witness in this case." It went on to say that, when Harris first testified, Rothblatt assumed "he was among the inmates who had refused to talk to Mr. Goldfarb in September." The affidavit stated that he (Rothblatt) did not become aware of the memoranda prepared by Goldfarb until after he had returned to his office in New York following the declaration of the mis-

trial. The Rothblatt affidavit concluded that "in over 35 years as an active trial practitioner I have never undertaken, and would certainly never recommend, the reckless trial strategy suggested by the Government." Judge Zampano below found that "it is plain from the record that there was neither impropriety [n]or misconduct on the part of defense counsel" and that Rothblatt had performed his "affirmative duty to notify the trial judge that a witness had recanted his sworn testimony." 413 F.Supp. at 171.

■ There is nothing in this record to contradict either Mr. Rothblatt's affidavit or Judge Zampano's finding of "neither impropriety [n]or misconduct." Moreover, it hardly seems likely that experienced trial counsel would run the risk, had he known of the statement to Goldfarb, of letting Harris leave the stand without cross-examination in regard to that statement, failing to introduce the statement itself (after authentication by Goldfarb if necessary), and waiting for a possible further recantation that could be tape-recorded. The contrary suggestion seems to us farfetched; the Government here impugns Mr. Rothblatt's integrity as a member of the Bar and officer of the court based purely on conjecture. There is nothing to indicate that Mr. Rothblatt initiated the jail visit resulting in the tape recording. Quite to the contrary, so far as appears Harris himself initiated it. Nor was there anything improper in Mr. Rothblatt's visiting Harris during the trial in the absence of Government counsel and without advising Government counsel of Harris's request for the visit. Our adversary system prescribes no legal or moral duty that would require counsel to advise his opponent that a witness who has previously testified for the opponent in a pending case wants to talk with him.

## III.

■ When a mistrial is declared sua sponte by a court without defendant's consent, express or implied, the double jeopardy clause permits retrial of the defendant only if, in the words of Mr. Justice Story, "there [was] a manifest necessity for the [mistrial], or the ends of public justice would otherwise be defeated." *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). This court has recently commented in *United States v. Gentile, supra,* 525 F.2d at 255, on the "wisdom" of Justice Story's further statement in *Perez* that "it is impossible to define all the circumstances which would render it proper" for the trial court to grant a mistrial without giving rise to a defense of double jeopardy, 22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165, and Mr. Justice Black's comment in *Wade v. Hunter,* 336 U.S. 684, 690, 69 S.Ct. 834, 93 L.Ed. 974 (1949), relative to the impossibility of laying down a "rigid formula" on the subject. *See also Illinois v. Somerville, supra,* 410 U.S. at 464, 93 S.Ct. 1066.

At the same time, as Judge Waterman once suggested, *United States v. Gori,* 282 F.2d 43, 50 (2d Cir. 1960) (en banc) (dissenting opinion), *aff'd,* 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961), it has not always been crystal clear how much discretion the *Perez* test leaves to a trial judge in a given set of circumstances. The very vagueness of the Story formulation, while maintaining its verity, necessarily makes application imprecise. *See* Comment, *Double Jeopardy and Reprosecution After Mistrial: Is the Manifest Necessity Test Manifestly Necessary?,* 69 Nw.U.L.Rev. 887, 890 (1975). It was once thought, for example, that a sua sponte mistrial did not bar retrial if the mistrial had been declared "in the sole interest of the defendant." *Gori v. United States,* 367 U.S. 364, 369, 81 S.Ct. 1523, 1527, 6 L.Ed.2d 901 (1961).[1] But we are

---

1. Even if this test still governed, it would not allow retrial here. Judge Clarie declared the mistrial to be in the interest of the defendant, but the judge himself noted that Harris was a "crucial" Government witness whose lack of credibility "contaminate[d] the trial." Had the evidence of the recantation been adduced, de- spite the introduction in rebuttal of Harris's grand jury testimony, or contrary testimony by the Government agents, the jury, like Judge Clarie, in all probability would not have believed Harris's testimony in any respect. The declaration of a mistrial did operate to prevent the defense from discrediting a key Govern-

now required, in resolving the question of "manifest necessity," to determine whether the trial judge considered all the procedural alternatives to a mistrial, so as "not to foreclose the defendant's option [to have his cause tried by the original jury] until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion of Harlan, J.).[2] *Jorn* has been read to require the trial judge at least to consider viable alternative curative measures before sua sponte declaring a mistrial. *See, e. g., United States ex rel. Stewart v. Hewitt*, 517 F.2d 993, 996 (3d Cir. 1975); *United States v. Spinella*, 506 F.2d 426, 432 (5th Cir.) (Wisdom, J.), *cert. denied*, 423 U.S.

917, 96 S.Ct. 227, 46 L.Ed.2d 147 (1975); *United States v. Lansdown*, 460 F.2d 164, 168–69 (4th Cir. 1972).

■ Since evaluation of discretion is involved, a necessary procedural corollary of *Jorn* is that, before a trial judge declares a mistrial, he must make explicit findings, preferably after a hearing, that there are no reasonable alternatives to mistrial. *See, e. g., Whitfield v. Warden*, 486 F.2d 1118, 1122 (4th Cir. 1973), *cert. denied*, 419 U.S. 876, 95 S.Ct. 139, 42 L.Ed.2d 116 (1974). If no alternatives can be found, a mistrial may be declared, and a retrial cannot be attacked on double jeopardy grounds unless wrongdoing or negligence on the part of the Government caused the mistrial. *See United States v. Glover*, 506 F.2d 291 (2d Cir. 1974). Thus society's interest in "fair trials designed to end in just judgments,"

ment witness on an essential element of the crime, a likely source of unreported income, as to the tax year 1970, and from more generally claiming Government misconduct in the case. Further, as Judge Zampano held, 413 F.Supp. at 172, reprosecution would have given the Government "a solid tactical advantage." It could have refrained from calling Harris and presented its case against appellee for the year 1970 without his testimony or proceeded to seek convictions solely for the years 1969 and 1971. *Cf. United States v. Kin Ping Cheung*, 485 F.2d 689, 691–92 (5th Cir. 1973) (Government on retrial could sever and avoid embarrassment of having its own witness exculpate a defendant).

2.  In *United States v. Gentile*, 525 F.2d 252, 257 (2d Cir. 1975), dicta suggest that the *Jorn* test is itself dicta and the holding a mere reaffirmation of *Gori*, and that *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), vitiated the force of the *Jorn* rationale. But the "consideration of other alternatives" test in *Jorn* seems, with due respect to the *Gentile* opinion writer, more likely to have been the central holding of the case. After reviewing the history of the double jeopardy clause in the Supreme Court, and concluding that even under the *Gori* "sole interest" test there was not a case of mistrial solely for defendant's benefit, Mr. Justice Harlan continued that the *Gori* test "does not adequately satisfy the policies underpinning the double jeopardy provision," 400 U.S. at 483, 91 S.Ct. at 556, because declaration of a mistrial, even solely for defendant's benefit, but without his consent and without exploration of other means of dealing with the situation, overlooks one of a defendant's rights in a criminal prosecution: the "valued right to have

his trial completed by a particular tribunal." *Id.* at 484, 91 S.Ct. at 557, *quoting Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949). Justice Harlan's plurality opinion thus lays it down as a constitutional principle that a judge "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." 400 U.S. at 486, 91 S.Ct. at 558. Section III of the *Jorn* opinion applies the law to the facts of the case solely under the "consideration of other alternatives" doctrine rather than the *Gori* "sole interest" analysis.

*Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), does not vitiate the force of *Jorn, id.* at 471, 91 S.Ct. 547, but rather articulates the sensible exception to it, that "where the declaration of a mistrial implements a reasonable state policy *and* aborts a proceeding that *at best* would have produced a verdict that could have been upset at will by one of the parties, the defendant's interest in proceeding to verdict is outweighed by the competing and equally legitimate demand for public justice." *Id.* at 471, 93 S.Ct. at 1074 (emphasis added). *Somerville* holds, then, that the double jeopardy clause will not bar retrial even though the examination of alternatives mandated by *Jorn* is not undertaken if to do so would be futile because clearly no reasonable alternative existed. *Accord, United States ex rel. Stewart v. Hewitt*, 517 F.2d 993, 996 (3d Cir. 1975); *United States v. Williams*, 411 F.Supp. 854, 858 (S.D.N.Y.1976).

*Illinois v. Somerville, supra,* 410 U.S. at 470, 93 S.Ct. at 1073, is protected. If reasonable alternatives to a mistrial are available, the trial should continue.

■ A failure to make any findings denigrates the defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter, supra,* 336 U.S. at 689, 69 S.Ct. at 837, *quoted in United States v. Jorn, supra,* 400 U.S. at 484, 91 S.Ct. 547. For this reason, when a trial ends in a mistrial without any findings having been made as to alternatives to mistrial, the double jeopardy clause will usually bar a retrial of the defendant. This would not hold true in cases in which it is clear that there are no alternatives. Note 2 *supra.* When, for example, the trial, if continued, "at best would have produced a verdict that could [be] upset at will by one of the parties," *Illinois v. Somerville, supra,* 410 U.S. at 471, 93 S.Ct. at 1074; *cf. United States v. Gentile, supra,* 525 F.2d at 258 (multiple defendants created "dilemma" for trial judge, in that either declaring mistrial or continuing trial could have led to contention of error by one of the defendants), no findings are required for a declaration of mistrial, and the double jeopardy clause will not bar retrial. *See United States ex rel.*

*Stewart v. Hewitt, supra,* 517 F.2d at 996; *United States v. Williams,* 411 F.Supp. 854, 858 (S.D.N.Y.1976). In all but the clearest cases, explicit findings are the best way for a trial judge to avoid the perils of the double jeopardy clause.

■ On the facts of the instant case, in which obvious alternatives to mistrial existed but were not explored, we hold that the double jeopardy clause bars retrial. The options available to Judge Clarie were several. Harris could have been recalled for further defense cross-examination, and, in the event his claim of Fifth Amendment privilege were upheld, he could have been granted immunity from possible perjury charges in order to force him to testify. *See United States v. Spinella, supra,* 506 F.2d at 432. Alternatively, upon such recall, the tape recording of his recantation could have been admitted. *See* Fed.R.Evid. 804(a)(1), (2), (b)(3)(5). His previous testimony could have been struck with appropriate instructions. *See United States v. Newman,* 490 F.2d 139, 144–46 (3d Cir. 1974); *United States v. Cardillo,* 316 F.2d 606, 611–13 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). Any consideration of these reasonable possibilities was at best oblique.[3] And, while the

---

3. In declaring a mistrial, Judge Clarie stated:

The Court has, as counsel may well imagine, has given considerable thought to this problem that has arisen. I never had the question arise in this form during a trial before.

But the Court is of the opinion that because of the perjury issue injected into the trial by the testimony of Daniel Harris, that the defendant Grasso can not get a fair and impartial trial under the present circumstances.

If the issue went to the jury it would not be whether or not he failed to pay his income taxes; the issue would be of selling narcotics, which is in and of itself a kind of abhorrent business to most every one of us. The issue would become whether or not he was selling narcotics, and whether or not this man, Daniel Harris, would be believed.

To do that we'd have to go 'way back to the statement to the three Hartford policemen and the County Detective in '71, and get the facts as to how the story originated, with the documents which are in evidence. And we'd have to begin to review the testimony

before the grand jury that Mr. Buckley deduced when he was prosecutor, or assistant prosecutor.

We'd have to review the tape, as has been filed in evidence by counsel, which he procured at the jail. We'd have to review the statement of the I.R.S. witnesses, who went over and received from him what is claimed to be an apparent contradiction of the tape.

And the issue of Mr. Grasso's income tax evasion would be well lost in the question of whether or not Daniel Harris committed perjury. That would be the nub of the case, rather than the question of the defendant's failure to pay his income taxes.

For this reason the Court is of the opinion that the motion to dismiss would be denied, but that a mistrial should be ordered, because there is a manifest necessity for declaring a mistrial. Otherwise, the ends of justice, public justice, would be defeated.

And that is what the Court is going to do. The Court is of the opinion that to permit the trial to go forward under the present circumstances would be an injustice to Mr. Grasso.

judge was acting with the very best of intentions, to protect the defendant from an unfair trial, the appropriate course was to solicit suggested alternatives from defense counsel. *See Whitfield v. Warden, supra,* 486 F.2d at 1123; *Jones v. Anderson,* 404 F.Supp. 182, 188 (S.D.Ga.1974), *aff'd,* 522 F.2d 181 (5th Cir. 1975); Note, *supra,* 49 N.Y.U.L.Rev. at 952. This procedure may result in counsel's consent to the mistrial, or in his insistence on dismissal as the only alternative. *See United States v. Sedgwick,* 345 A.2d 465, 473 (D.C.App.), *cert. denied,* 423 U.S. 1028, 96 S.Ct. 558, 46 L.Ed.2d 402 (1975). In either case, defendant cannot then argue on appeal that there were other reasonable alternatives to mistrial that should have been explored. The responsibility, however, is on the court to ask, and not on the defendant on his own to suggest, alternatives in a sua sponte mistrial situation. Useful alternatives may result from such an inquiry, although of course the court is free explicitly to reject them as inadequate to cure the situation.

There can be no claim here that, if continued, the proceeding would have produced a verdict that could have been upset at will by one of the parties. Striking Harris's testimony, for example, would almost certainly not have resulted in reversible error. The Government, moreover, had proof of other sources of 1970 income (such as from defendant's bail bonding business) that would have likely produced unreported income. Even were this not so, the case certainly could have gone to the jury with regard to calendar years 1969 and 1971.

Here, after argument on a motion to dismiss, the court declared a mistrial without hearing either side's views on the subject. This was done with no mention of the alternatives raised above, and no findings on the question of alternatives, the statement being only that the issues would be confused if the trial were continued. *See* note 3 *supra.* As was true in *Jorn,* however well intentioned, the trial judge here "made no effort to exercise a sound discretion to

assure that, taking all the circumstances into account, there was a manifest necessity for the *sua sponte* declaration of this mistrial." 400 U.S. at 487, 91 S.Ct. at 558, *quoted in Illinois v. Somerville, supra,* 410 U.S. at 466, 93 S.Ct. 1066, at 1071.

Judgment affirmed.

TIMBERS, Circuit Judge, dissenting:

In the name of the double jeopardy clause of the Fifth Amendment of the United States Constitution,[1] the majority has sanctioned the dismissal of a federal income tax evasion indictment after eight days of trial and at a time when the trial was all but concluded. Since I believe that the majority has either ignored or glossed over critical facts with respect to the combined conduct of defendant and his trial counsel, and that such conduct heavily contributed to, and amounted to implied consent to, the trial court's declaration of a mistrial, I respectfully dissent.

I.

Since "virtually all [double jeopardy] cases turn on the particular facts  . .", *Illinois v. Somerville,* 410 U.S. 458, 464 (1973), a good starting point here is a brief reference to important facts ignored by the majority which precipitated the mistrial and the subsequent double jeopardy claim.

On September 9, 1975—two months before Grasso's income tax evasion trial began in the district court—government witness Harris told a member of the staff of defense attorney Rothblatt that his testimony before the grand jury regarding Grasso's narcotics dealings had been false. During the course of Grasso's trial which began on November 6, the government made out against him a strong case of unreported income for the years 1969 and 1971. On November 11 and 12 Harris testified for the government regarding the year 1970. Harris did not testify at all regarding 1969 or 1971. On November 12 Rothblatt informed the court that the witness Harris previously

---

1. " . . . nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb;  . . . ." U.S.Const., amend. V, cl. 2.

had refused to be interviewed by a member of his staff.

On the evening of November 20—after Rothblatt had rested defendant's case and after Rothblatt's motion for a directed verdict had been denied—Rothblatt had a tape-recorded interview with Harris, during the course of which Harris recanted his testimony. Less than two hours later Harris recanted his recantation to Special Agents of the Intelligence Division of the Internal Revenue Service. Harris told the I.R.S. agents that his recantation to Rothblatt was a lie which had been induced by threats.

On the next day, November 21, with the trial all but over, Rothblatt informed Chief Judge Clarie of Harris' recantation and moved to dismiss the indictment on the ground of *prosecutorial misconduct.* After three days of hearings out of the presence of the jury, the court on November 26 declared a mistrial sua sponte.

The September 9 memorandum of the interview between Harris and a member of Rothblatt's staff, during which Harris disclosed that he had lied before the grand jury, came to light subsequent to Judge Clarie's declaration of a mistrial. When it did come to light, Rothblatt, who was the attorney of record in the civil action in connection with which the interview with Harris had been conducted, filed an affidavit stating that he "was simply not aware" of the memorandum until after the mistrial had been declared.

Whatever may be said as to the knowledge on the part of the *Rothblatt firm* regarding the existence of the memorandum of the critical interview with Harris two months before the tax evasion trial of Rothblatt's client began,[2] I recognize that this case is on a different footing with respect to the volitional element which was present in other cases where consent to a mistrial has been implied from the conduct of defense counsel. See, e. g., *United*

*States v. Gentile,* 525 F.2d 252 (2 Cir. 1975), *cert. denied,* 425 U.S. 903 (1976). Nevertheless, I find it difficult to blink at the hard fact that Grasso here invokes the protection of the double jeopardy clause triggered by the declaration of a mistrial which was granted to remedy a prejudicial situation brought about by his counsel's negligent failure to examine his own records. If Rothblatt had checked his office records, as he said he would, after the matter of a prior interview of Harris by a member of Rothblatt's staff came up in court on November 12, Harris' credibility of course would have emerged as a principal issue at the appropriate time, namely, upon Rothblatt's cross-examination of Harris.

II.

It seems to me that the concept of implied consent to the declaration of a mistrial, as applied to the facts of this case, involves more than scrutiny of counsel's role in precipitating the sua sponte ruling. Counsel should bear the responsibility, at the very least, to state his client's objection to the mistrial declaration and to assert his client's "valued right to have his trial completed by a particular tribunal", *Wade v. Hunter,* 336 U.S. 684, 689 (1949), *at the time the mistrial is declared,* and not sit back and wait for a subsequent double jeopardy hearing.

Here defendant's counsel did almost precisely the opposite. In declaring a mistrial, Judge Clarie stated that "the defendant Grasso can not get a fair and impartial trial under the present circumstances." To this attorney Rothblatt responded:

"[T]he defendant agrees with everything that your Honor has decided, except your Honor's decision to declare it a mistrial. We would renew our request for judgment of acquittal." (emphasis added).

After the case was reassigned for trial, Grasso's counsel discovered that his client did not agree at all with everything Judge

---

**2.** I had supposed that the day had long since passed when one member of a law firm would be permitted to disclaim knowledge of the existence of a critical document in the possession of his firm—when the disclaimer of such knowledge is invoked to cloak his client with the protection of the double jeopardy clause.

Clarie had decided. He asserted for the first time that Judge Clarie had ignored "several ways to cope with [Harris' recantation] without introducing reversible error. . . . [T]here was simply no justification . . . for taking away the defendant's opportunity for a favorable verdict."

As the majority holds, Rothblatt's statement in response to Judge Clarie's declaration of a mistrial on November 26 cannot be read as an *objection* to a mistrial. Unlike the majority I am not at all sure that the statement did not amount to an express *consent* to a mistrial. But whether it did or not, such an affirmative effort on the part of defendant's counsel to reinforce the trial judge's position hardly can be dismissed as "silence".

In any event, I would hold that Grasso's failure to object to the mistrial constitutes a bar to his subsequent double jeopardy claim. Other courts have required affirmative conduct on the part of a defendant to preserve a double jeopardy claim.[3] See, e. g., *United States v. Gordy*, 526 F.2d 631, 635 & n. 1 (5 Cir. 1976); *United States v. Phillips*, 431 F.2d 949 (3 Cir. 1970); *United States v. Sedgwick*, 345 A.2d 465, 473 (D.C. Ct.App.1975), *cert. denied*, 423 U.S. 1028 (1975); *cf. Scott v. United States*, 202 F.2d 354 (D.C.Cir.), *cert. denied*, 344 U.S. 879 (1952). But see *Himmelfarb v. United States*, 175 F.2d 924 (9 Cir.), *cert. denied*, 338 U.S. 860 (1949); *People v. Compton*, 6 Cal.3d 55, 63, 490 P.2d 537, 542, 98 Cal.Rptr. 217, 222 (1971). And our Court has held defendants culpable for their silence in three cases where we have rejected double jeopardy claims. *United States v. Gentile*, *supra*, 525 F.2d at 255; *United States v. Beckerman*, 516 F.2d 905, 909 (2 Cir. 1975); *United States v. Goldstein*, 479 F.2d 1061, 1067 (2 Cir.), *cert. denied*, 414 U.S. 873

(1973). In each of these cases, in holding the defendant to have consented impliedly to the declaration of a mistrial, we weighed as a principal factor the defendant's failure to assert his interest in having his guilt determined by the existing jury.

These decisions recognize that the double jeopardy clause does not confer upon a defendant a license to take undue advantage of the contradictory possibilities which arise when a mistrial is declared. I would not construe the double jeopardy clause so as to permit a defendant who is ready to sacrifice his interest in reaching an existing jury in exchange for a dismissal on double jeopardy grounds to obviate the need for his reaching any jury at all. Such a defendant might be all too willing to sit by silently and refrain from bringing to the trial court's attention alternative solutions.[4] I see nothing in the double jeopardy bar which either requires that this choice be left to the defendant or which relieves him of the normal obligation to make a timely objection to an adverse ruling by the trial court. On the contrary, requiring the defendant to assert his right to have his guilt decided by the existing jury will assure that a subsequent double jeopardy dismissal in fact does serve to vindicate the right asserted. Such a requirement moreover would tend to alleviate the problems which underlay the holding of *Gori v. United States*, 367 U.S. 364, 369 (1961), that a mistrial "granted in the sole interest of the defendant" does not necessarily bar all retrial. Protecting a defendant's interests through resort to a mistrial would be much less a matter of navigating "a narrow compass between Scylla and Charybdis", *id.*, if the defendant could be relied upon, and indeed required, to participate in the determination.[5]

---

**3.** The Supreme Court explicitly left this question open in *Gori v. United States*, 367 U.S. 364, 365 n. 6 (1961).

    A knowing, voluntary, and intelligent waiver of a double jeopardy right is not a condition to permitting a retrial following a mistrial. *United States v. Dinitz*, 424 U.S. 600, 609 n. 11 (1976).

**4.** Grasso's about face in first agreeing and then disagreeing with Judge Clarie's ruling of November 26 is a striking example.

**5.** Judge Friendly concluded in *United States v. Gentile*, *supra*, 525 F.2d at 256–57, that the continuing validity of the *Gori* approach was put into question by Mr. Justice Harlan's plurality opinion in *United States v. Jorn*, 400 U.S. 470 (1971), but that in light of *Illinois v. Somer-*

A requirement that the *defendant* take affirmative steps to preserve his right to a determination by the existing jury ultimately looks toward the same end the majority seeks to achieve by requiring the *trial judge* to make "explicit findings, preferably after a hearing, that there are no reasonable alternatives to mistrial." Ante, p. 52. The common objective of both the majority and this dissent is a reasoned consideration of possible alternatives—insulated from the heat of the kitchen into which the trial judge is thrust when compelled to declare a mistrial sua sponte. But I disagree with the majority's premise that procedural strictures applicable to the trial court alone will protect fully the integrity of the double jeopardy prohibition. The majority, while placing all responsibility on the court's shoulders, appears to rely on the therapeutic effect of a hearing to coax the defendant out of his corner and into taking a stand.

> "This procedure may result in counsel's consent to the mistrial, or in his insistence on dismissal as the only alternative. . . . In either case, defendant cannot then argue on appeal that there were other reasonable alternatives to mistrial that should have been explored." 552 F.2d at 54.

Aside from its misplaced reliance on what does *not* go on in the realistic world of the trial court, the majority ignores the fact that, even after a sua sponte declaration of a mistrial, a proceeding must have participating parties. Since the very reason for requiring a hearing to determine the grounds for a mistrial declaration is to protect a right of the defendant, it does not strike me as unreasonable in the context of

*ville,* 410 U.S. 458 (1973), it cannot yet be consigned to oblivion with any certainty. I continue to prefer Judge Friendly's cautious assessment in *Gentile* rather than the attenuated footnote treatment by the majority here. Ante, pp. 51–52 n. 2.

**6.** Ironically, although I would remand the case for reinstatement of the indictment and retrial, whereas the majority affirms the judgment of the district court, I do *not* share the majority's

our adversary system to require him to assert that right.

I would remand with instructions to reinstate the indictment for retrial.[6]

criticism of the conduct of the district court. Ante, pp. 53–54. Based on my careful review of the entire record, I am satisfied that both Chief Judge Clarie and Judge Zampano, on the facts before them, discharged their respective judicial responsibilities in a commendable fashion. My quarrel with the result, and hence my dissent, is directed at quite a different quarter, as my dissenting opinion makes plain.